LFS

MAYS, CONNARD AND ROTENBERG, LLP
CHRISTOPHER B. CONNARD, Esquire
Attorney I.D. No. 201749
1235 Penn Avenue, Suite 202
Wyomissing, PA 19610
610.400.0481 (fax) 610.350.4608

$400.00

Attorney for Plaintiff James N. Hollinger

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA CIVIL ACTION—LAW A/R

|  |  |  |
|---|---|---|
| JAMES N. HOLLINGER<br>231 Chapel Terrace,<br>Reading, Pa. 19601 | : | |
| | : | JURY TRIAL DEMANDED<br>Docket No. : 15- 5249 |
| v. | : | |
| READING HEALTH SYSTEM<br>Sixth Avenue and Spruce Street<br>West Reading, Pa. 19611 | : |  |
| and | : | |
| SACHIN L. SHRESTHA, MD<br>559 West Germantown Pike<br>East Norriton, Pa. 19403-4250 | : | |
| and | : | |
| ROBERT JENKINS, MD<br>Sixth Avenue and Spruce Street<br>West Reading, Pa. 19611 | : | |
| and | : | |
| SHIKHA DOOMRA, MD<br>Sixth Avenue and Spruce Street<br>West Reading, Pa. 19611 | : | |

FILED
SEP 2 1 2015
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

S

## COMPLAINT

Plaintiff James N. Hollinger, by and through his undersigned attorneys, Christopher B. Connard and Mays, Connard & Rotenberg, LLP, brings this action against the Reading Health System and doctors Sachin L. Shrestha, Robert Jenkins, and Shikha Doomra. In support thereof Plaintiff avers as follows:

## PARTIES

1.     Plaintiff James N. Hollinger is an adult individual currently residing at 231 Chapel Terrace, Reading, Pennsylvania 19601, who at all times relevant to the matters in this complaint was treated at the Reading Hospital in West Reading, Pennsylvania.

2.     Defendant Reading Health System (hereinafter "Hospital" or "RHS") is a non-profit provider of medical care, and operator of the Reading Hospital, with its main campus and administrative offices located a Sixth Avenue and Spruce Street in West Reading, Pennsylvania 19611.

3.     Within the Reading Hospital, Defendant Reading Health System operates a dedicated Emergency Department which offers emergency medical services.

4.     Upon information and belief, the Hospital receives federal funding and accepts payments from Medicare and Medicaid.

5.     Defendant Sachin Shrestha, MD is a physician with an office address at 599 West Germantown Pike, East Norriton, Pennsylvania 19403, who at all times relevant to the matters in this complaint practiced internal medicine at the Hospital and was its employee or agent.

2

6.      Defendant Robert Jenkins, MD is a physician with an office address at Sixth Avenue and Spruce Street, West Reading, Pennsylvania 19611, who at all times relevant to the matters in this complaint practiced psychiatry at the Hospital and was its employee or agent.

7.      Defendant Shikha Doomra, MD is a physician with an office address at Sixth Avenue and Spruce Street, West Reading, Pennsylvania 19611, who at all times relevant to the matters in this complaint practiced internal medicine at the Hospital and was its employee or agent.

## JURISDICTION

8.      This Court has subject matter jurisdiction over federal claims under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, *et seq.*, the Rehabilitation Act of 1974, 29 U.S.C. § 794(a), *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12182(a), *et seq.*

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

10.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because all events giving rise to Plaintiff's claims took place in Berks County, Pennsylvania. In addition, all Defendants can be found within this judicial district.

## FACTS

11.      On or about September 9, 2013, Plaintiff James Hollinger was a 63-year-old man who presented at the Hospital Emergency Room with seizures.

12.      Plaintiff had been found unresponsive and incontinent of stool on the porch of a building from which he had been evicted.

3

13.     Witnesses reported that Plaintiff had had a grand mal seizure. When awoken by EMS, Plaintiff began to have another seizure.

14.     Plaintiff was then admitted to the Hospital Emergency Department and treated by Kara Mischler, MD.

15.     Dr. Mischler noted that Plaintiff experienced confusion and loss of consciousness.

16.     Dr. Mischler suspected that the seizures were caused by alcohol withdrawal and consulted with the trauma department.

17.     While in the Emergency Department, Plaintiff had an additional seizure.

18.     On or about September 9, 2013, Plaintiff's brain was subject to a CT Scan which was interpreted by radiologist Brent Wagner, MD.

19.     Dr. Wagner noted that Plaintiff's brain showed advanced atrophy unusual for his age and chronic microvascular ischemia, which are indicative of small strokes.

20.     Plaintiff was transferred from the trauma bay on September 9, 2013.

21.     After his transfer from the trauma unit, Nurse Judy C. Kilduff noted that although he was alert, Plaintiff was "hollering obscenities" and would not answer her questions.

22.     On September 10, 2013, Plaintiff was evaluated by neurologist Sowmya Lakshminarayanan, MD.

23.     Dr. Lakshminarayanan noted that Plaintiff had no new neurological complaints; could not remember events that transpired just before his admission to the Hospital; sporadically used profanities; and was concerned about getting home to his newly adopted German Shepherd puppy.

24.     Dr. Lakshminarayanan concluded that Plaintiff's seizure activity was likely due to alcohol withdrawal.

4

25.     Plaintiff was assigned to attending physician Defendant Shikha Doomra after his admission on September 9, 2013.

26.     Despite Dr. Mischler and Dr. Lakshminarayanan's diagnoses of alcohol withdrawal, Defendant Doomra did not initiate the Alcohol Withdrawal Protocol.

27.     On information and belief, Defendant Hospital has an established Alcohol Withdrawal Protocol.

28.     In fact, Plaintiff was not started on the standard Alcohol Withdrawal Protocol until September 14, 2013, when a nurse, concerned about Plaintiff's ongoing agitation, brought this mistake to the attention of Shailaja Amirishetty, MD.

29.     Dr. Amirishetty ordered an increased dose of Ativan to help with Plaintiff's agitation.

30.     The following day, Defendant Doomra discontinued Plaintiff's use of Ativan for alcohol withdrawal.

31.     Plaintiff's acute symptoms of alcohol withdrawal—other than seizures—continued throughout his stay at the Hospital as he experienced agitation, delirium and impaired cognition, was unable to care for himself or make decisions, and was consistently assessed as unsafe for discharge.

32.     Defendants overestimated the period of time for which Plaintiff was being aggressively treated for alcohol withdrawal; therefore although he showed signs of withdrawal and even delirium tremens ("DTs") throughout his treatment, Defendants failed to recognize those symptoms of his withdrawal.

5

33. Throughout his stay, Plaintiff spoke of his need to return to his home and attend to his dog. Hospital staff members confirmed that these ideas were delusions; Plaintiff's home had been foreclosed upon and secured, and Plaintiff's dog had been dead for more than a year.

34. Moreover, although he came to the Hospital following a neurological attack, Plaintiff had obvious, acute symptoms of dysfunction related to mobility as he was unsteady on his feet and at high risk for falls.

35. Plaintiff fell twice during his hospital stay.

36. At the recommendation of psychiatric staff, Plaintiff was assigned 1:1 nursing care and alarms were placed on his bed and chair to insure that staff were notified if he moved.

37. Plaintiff's condition did not improve in the days immediately prior to his discharge from the Hospital.

38. On September 18, 2013, Nurse Erin N. Lender noted that Plaintiff continued to be in danger of falling and was also "confused at times to surroundings."

39. Nurse Lender had Plaintiff's bed moved closer to the nursing station so that he could be monitored.

40. On September 19, 2013 at 11:04 a.m., Plaintiff underwent physical therapy with Teresa Feiler, MSPT.

41. Ms. Feiler noted that Plaintiff seemed agitated and fixated on finding cigarettes that he had purchased but could not find "in his apt yesterday when he was there."

42. Ms. Feiler described Plaintiff as confused, disoriented, and unsafe to discharge.

43. On September 19, 2013 at 10:21 p.m., social worker Bonnie J. Werley, ACBSW, evaluated Plaintiff for potential discharge. Ms. Werley concluded that Plaintiff "is not felt to be safe to go home."

6

44.    Plaintiff was anxious to go home to be with his dog. He would not accept Ms. Werley's contention—which had been confirmed by police—that his home had been foreclosed upon and his dog had been dead for a year.

45.    Ms. Werley noted "I'm quite sure he would sign out AMA at his first opportunity and yet he does not appear that he can function on his own."

46.    Ms. Werley recommended that the Hospital seek a court-appointed guardian for Plaintiff because he was incapable of making safe decisions and because she had made multiple unsuccessful efforts to locate a power of attorney for Plaintiff.

47.    Ms. Werley further noted that Plaintiff was "unsteady on his feet and not safe to get around on his own."

48.    Because of those features and Plaintiff's homeless status, Ms. Werley recommended that Plaintiff be placed in a skilled nursing facility.

49.    Shortly after twelve a.m. on September 20, 2013, nurse Aimee Crisco noted that Plaintiff had begun to try to hit staff members and had insisted on going to the refrigerator.

50.    At 9:10 a.m. on September 20, 2013, nurse Lydia Davis noted that Plaintiff seemed agitated and combative, as well as disoriented to place and situation.

51.    Nurse Davis paged Defendant Shrestha to report Plaintiff's condition, but Defendant Shrestha did not issue any new orders to treat the increased aggressiveness noted by Nurse Davis.

52.    As early as September 10, 2013, Plaintiff had been assessed by psychiatrist Zahid Awan, MD, who specifically recommended a dose of Haldol in the event that Plaintiff became aggressive with staff.

53.    At 12:00 p.m., Nurse Davis continued to note Plaintiff's disorientation.

7

54. In the afternoon of September 20, 2013, Plaintiff slapped Nurse Davis in the face.

55. Plaintiff, who is right-handed, slapped Nurse Davis with an open left hand.

56. At the time, Plaintiff was not fully ambulatory and was using a geriatric chair while he learned to use a rolling walker.

57. Hospital Security responded and called the West Reading Police Department at approximately 12:26 p.m.

58. At 3:15 p.m. on September 20, 2013, Defendant Shrestha requested that Plaintiff be reevaluated by a psychiatrist, given that Plaintiff had been previously judged incapable of safe discharge and decision-making.

59. On September 20, 2013, Defendant Jenkins, after reviewing "recent" progress notes and speaking with Defendant Shrestha, evaluated Plaintiff at 5:49 p.m.

60. Defendant Jenkins noted that Plaintiff admitted to being "physically aggressive" with a nurse.

61. Defendant Jenkins wrote in his notes that Plaintiff's delirium had resolved.

62. Defendant Jenkins also wrote "patient is at high risk of violent behavior and 1:1 observation is recommended for safety."

63. At the same time, Defendant Jenkins also concluded that the Defendant "possesses capacity to make his own medical decisions."

64. In the period between social worker Bonnie Werley's conclusion that Plaintiff was so incapacitated he required a guardian and Defendant Jenkins' conclusion that Plaintiff could be safely discharged, only one thing had changed: Plaintiff had slapped a nurse.

65. In fact, in the period between the notes from Werley and Jenkins, multiple nurses had observed that Plaintiff's condition was deteriorating.

8

66. Plaintiff was discharged from the Hospital on September 20, 2013 at 7:28 p.m. by Defendant Shrestha, with approval from Defendant Jenkins.

67. Defendant Shrestha's discharge summary described Plaintiff's delirium related to alcohol abuse as "resolved," and noted that, although he had been recently deemed incapable of making a decision, he was now capable of making a decision regarding his discharge.

68. The note further explained that the patient had "assaulted nurse," charges had been pressed, and he was likely to be arrested by police upon discharge.

69. Defendant Shrestha's discharge notes make no reference to Plaintiff's ongoing inability to walk or move independently, or to the physical therapy that Plaintiff was undergoing.

70. West Reading police escorted Plaintiff from the Hospital in a wheelchair on September 20, 2013 at 7:28 p.m.

71. Plaintiff was charged with aggravated assault, a felony of the second degree.

72. Plaintiff was taken to Berks County Prison, where, upon information and belief, he suffered additional grand mal seizures shortly after his arrival.

73. Plaintiff was confined at Berks County Prison for more than 200 days.

74. Prior to arriving at the Hospital on September 9, 2013, Plaintiff had no criminal record.

75. As a result of the Defendants' acts, omissions, and negligence, Plaintiff suffered lost income due to his felony arrest and incarceration.

76. As a result of Defendants' acts, omissions, and negligence, Plaintiff suffered emotional distress, pain and suffering, humiliation, and damage to his reputation from his felony arrest and 200 days in Berks County Prison.

9

Case 5:15-cv-05249-LS Document 1 Filed 09/21/15 Page 10 of 20

77.     As a result of Defendants' acts, omissions, and negligence, Plaintiff suffered physical and emotional distress because of the untreated grand mal seizures that he endured after his discharge from the Hospital.

78.     As a result of Defendants' acts, omissions, and negligence, Plaintiff's physical and mental health has deteriorated and he continues to be treated for anxiety.

## COUNT I – EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT: FAILURE TO STABILIZE
## PLAINTIFF V. READING HEALTH SYSTEM

79.     The allegations contained in the preceding paragraphs of the Complaint are incorporated herein by reference as if fully set forth at length.

80.     The Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et seq.*, requires hospitals to stabilize a patient's emergency medical condition prior to discharge or transfer.

81.     Defendant Hospital is liable under EMTALA for all actions of its staff, including the acts/omissions of Defendants Shrestha, Jenkins, and Doomra.

82.     Plaintiff arrived at Reading Hospital on September 9, 2013 manifesting acute symptoms of alcohol withdrawal, making him incapable of self-care and placing his health in serious jeopardy, thereby creating an emergency medical condition under EMTALA.

83.     Defendant's staff were aware of Plaintiff's emergency medical condition.

84.     In fact, Defendant Jenkins wrote that Plaintiff was at high risk for violence and required 1:1 observation.

85.     According to the interpretative guidelines for EMTALA produced by the Centers for Medicare and Medicaid Services, a patient's psychiatric condition is not stabilized if the patient presents a risk of harm to himself or others. 42 C.F.R. § 489.24(d)(1)(i).

86.     Moreover, Defendant Shrestha did not assess Plaintiff's capacity to move or walk safely prior to his discharge.

87.     Defendant's Shrestha's notes do not indicate any consideration of whether a patient unable to walk or move independently is a candidate for an appropriate discharge.

88.     Plaintiff was discharged from Reading Hospital on September 20, 2013 still manifesting acute symptoms of alcohol withdrawal, most notably agitation, confusion, and delirium.

89.     Plaintiff was discharged from the Hospital with an ongoing risk of grand mal seizures due to his continuing alcohol withdrawal.

90.     Plaintiff also left Reading Hospital manifesting acute physical symptoms of compromised mobility including an inability to walk and a high risk of falls.

91.     Defendant's staff were aware of Plaintiff's acute symptoms prior to his discharge on September 20, 2013 as Plaintiff's medical records are replete with references to his incapacity and inability to care for himself due to both physical and mental conditions.

92.     Defendant's staff were therefore aware of Plaintiff's emergency medical conditions at the time of discharge.

93.     The grand mal seizures Plaintiff suffered at Berks County Prison are further evidence that Plaintiff was not stabilized prior to his discharge from the Hospital.

94.     As a result of the actions of Defendant's agents, Plaintiff was discharged from the Hospital while suffering from multiple emergency medical conditions, in violation of EMTALA.

WHEREFORE, Plaintiff prays that the Court grant relief by

- Declaring that the acts and practices complained of herein violate EMTALA,

11

- Entering judgment against Defendant in an amount to be determined,

- Awarding compensatory and special damages for all losses Plaintiff has suffered or may suffer due to the conduct of Defendant's agents,

- Awarding punitive damages to the extent allowed under the law,

- Awarding Plaintiff the costs of litigation and reasonable attorneys' fees, and

- Granting any other relief the Court may find to be just and proper, including equitable and injunctive relief.

Plaintiff certifies pursuant to Local Civil Rule 53.2 § 3(c)(2) that the value of his claim is in excess of $150,000 exclusive of interests and costs.

## COUNT II- EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT:
## FAILURE TO SCREEN
## PLAINTIFF V. READING HEALTH SYSTEM

95.     The allegations contained in the preceding paragraphs of the Complaint are incorporated herein by reference as if fully set forth at length.

96.     The Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et seq.*, requires hospitals to provide appropriate medical screening for emergency medical conditions.

97.     Defendant is fully capable of providing screening for, and treating the symptoms of, alcohol withdrawal.

98.     Plaintiff manifested acute symptoms of alcohol withdrawal, an emergency medical condition under EMTALA, on September 20, 2013.

99.     Defendant's agent, Defendant Jenkins, failed to appropriately screen Plaintiff for alcohol withdrawal prior to discharge.

12

100. Defendant's agent Jenkins either failed to read, or intentionally disregarded, recent notes from Hospital staff indicating that Plaintiff was suffering from agitation, delusions, and cognitive impairment, all symptoms of alcohol withdrawal.

101. Defendant's agent Jenkins either failed to read, or intentionally disregarded, recent notes from Hospital staff indicating that Plaintiff was incapable of self-care or making appropriate decisions.

102. Defendant's agent Jenkins' notes did not explain, or even address, the vast discrepancy between his assessment of Plaintiff and the assessment of all previous consulting psychiatrists who concluded that Plaintiff could not be safely discharged.

103. The consult provided by Defendant's agent Jenkins on September 20, 2013 was not reasonably calculated to uncover Plaintiff's emergency medical conditions; instead it was a pretextual effort to create the paperwork necessary to enable the Hospital to rid itself of a difficult patient.

104. On information and belief, the screening performed by Defendant's agent Jenkins on Plaintiff was not a screening of the nature or quality that the Hospital uniformly provides to other patients presenting with substantially similar complaints.

105. Moreover, Defendant Shrestha did not assess Plaintiff's capacity to move or walk safely prior to his discharge.

106. Defendant Shrestha's notes do not indicate any consideration of whether a patient unable to walk or move independently is a candidate for an appropriate discharge.

107. On information and belief, the screening performed by Defendant's agent Shresthra was not a screening of the nature or quality that the Hospital uniformly provides to other patients presenting with substantially similar complaints.

13

108.    Defendant's agents failed to provide the screening that EMTALA mandates for all

patients displaying emergency medical conditions

WHEREFORE, Plaintiff prays that the Court grant relief by

- Declaring that the acts and practices complained of herein violate EMTALA,

- Entering judgment against Defendant in an amount to be determined,

- Awarding compensatory and damages for all losses Plaintiff has suffered or may suffer due to the conduct of Defendant's agents,

- Awarding punitive damages to the extent allowed under the law,

- Awarding Plaintiff the costs of litigation and reasonable attorneys' fees, and

- Granting any other relief the Court may find to be just and proper, including equitable and injunctive relief.

Plaintiff certifies pursuant to Local Civil Rule 53.2 § 3(c)(2) that the value of his claim is

in excess of $150,000 exclusive of interests and costs.

## COUNT III – AMERICANS WITH DISABILITIES ACT: DISCRIMINATION IN PROVISION OF PUBLIC ACCOMODATIONS, PLAINTIFF V. READING HEALTH SYSTEM

109.    The allegations contained in the preceding paragraphs of the Complaint are

incorporated herein by reference as if fully set forth at length.

110.    Defendant Hospital is a private entity that operates a "place of public

accommodation" within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12182(a), and is, therefore, subject to title III of the ADA which prohibits discrimination on the

basis of disability in the provision of services.

14

111.    The ADA defines a disability as a mental or physical condition that substantially limits an individual's ability to undertake major life activities. Self-care is considered a major life activity. 42 U.S.C.A. § 12102(2)(A).

112.    Plaintiff suffers from alcoholism.

113.    By September 20, 2013, Plaintiff's alcoholism had entirely eliminated his capacity for self-care and was thus a qualified disability under the ADA.

114.    Plaintiff believes, and therefore avers, that he was discharged from the Hospital in unstable condition because he slapped a staff member.

115.    In effect, Plaintiff was discharged from Defendant Hospital for manifesting the symptoms of his alcoholism and alcohol withdrawal, including agitation and confusion.

116.    When Plaintiff was discharged, he was denied needed medical services relating to his alcohol withdrawal.

117.    At the point of Plaintiff's discharge no reasonable accommodation or effort to treat the manifestations of his illness—such as providing the previously prescribed dose of Haldol—was made to permit his continuing care at Defendant Hospital.

118.    In discharging Plaintiff, Defendant Hospital denied him services based on his disability in violation of the ADA.

WHEREFORE, Plaintiff seeks reasonable attorneys' fees, costs, and injunctive relief in the form of an order requiring Defendant Hospital to:

> A. Stabilize all patients prior to discharge into law enforcement custody;
>
> B. Develop protocols requiring administrative review of cases involving allegations of violence by patients seeking treatment for recognized disabilities relating to mental health.

15

Plaintiff seeks such other, further relief that this court deems just, proper and equitable.

## COUNT IV – SECTION 504 OF THE REHABILITATION ACT OF 1973: PLAINTIFF V. READING HEALTH SYSTEM

119.    The allegations contained in the preceding paragraphs of the Complaint are incorporated herein by reference as if fully set forth at length.

120.    Pursuant to Section 504 of the Rehabilitation Act of 1973, no recipient of federal funds may exclude from programs and services an otherwise qualified individual based on their disability.

121.    Plaintiff, at all points relevant to this case, was disabled as defined under the Rehabilitation Act, because he suffered from a mental condition that impaired his ability to perform major life functions.

122.    At all points relevant to this case, Plaintiff suffered from alcoholism which impaired his ability to perform rudimentary self-care.

123.    Plaintiff was otherwise qualified to be at the Defendant Hospital; in fact, all Defendant Hospital staff members who reviewed his case as of September 20, 2013, had actively advocated for his continued stay.

124.    As noted above, Plaintiff was effectively discharged from the Hospital manifesting the symptoms of his disability, including agitation and confusion.

125.    In discharging Plaintiff, Defendant Hospital excluded Plaintiff from a federally-funded program based on his disability.

WHEREFORE, Plaintiff prays that the Court grant relief by

- Declaring that the acts and practices complained of herein violate the Rehabilitation Act,

- Entering judgment against Defendant in an amount to be determined,

16

- Awarding compensatory and special damages for all losses Plaintiff has suffered or may suffer due to the conduct of Defendant's agents,

- Awarding punitive damages to the extent allowed under the law,

- Awarding Plaintiff the costs of litigation and reasonable attorneys' fees, and

- Granting any other relief the Court may find to be just and proper, including equitable and injunctive relief.

Plaintiff certifies pursuant to Local Civil Rule 53.2 § 3(c)(2) that the value of his claim is in excess of $150,000 exclusive of interests and costs.

## COUNT V – MEDICAL NEGLIGENCE
## PLAINTIFF v. ALL DEFENDANTS

126.    The allegations contained in the preceding paragraphs of the Complaint are incorporated herein by reference as if fully set forth at length.

127.    Defendant Reading Health System is vicariously liable for all negligent acts of Defendant Shrestha, its agent.

128. The negligence of Defendant Shrestha consists of the following:

A.    Failure to recognize signs of delirium tremens in Plaintiff;

B.    Failure to diagnose alcohol withdrawal in Plaintiff on September 20, 2013;

C.    Failure to diagnose cognitive impairment in Plaintiff on September 20, 2013;

D.    Failure to administer Haldol, as recommended by psychiatry, to Plaintiff when he was reported to be extremely agitated on the morning of September 20, 2013;

E.    Failure to add orders for new medication of any kind when Plaintiff was reported to be extremely agitated on the morning of September 20, 2013;

17

F.  Discharging Plaintiff on September 20, 2013 while knowing him to be incapable of self-care;

G.  Discharging Plaintiff on September 20, 2013, while knowing him to be nearly immobile;

H.  Discharging Plaintiff on September 20, 2013 while knowing he was homeless;

I.  Discharging Plaintiff knowing that he had brain atrophy and likely permanent deficits making a legal guardian necessary.

129.  Defendant Reading Health System is vicariously liable for the negligent acts of Defendant Jenkins, its agent.

130.  The negligence of Defendant Jenkins consists of the following:

A.  Failure to recognize signs of delirium tremens in Plaintiff;

B.  Failure to diagnose alcohol withdrawal in Plaintiff on September 20, 2013;

C.  Failure to diagnose cognitive impairment in Plaintiff on September 20, 2013;

D.  Failure to administer Haldol, as recommended by a previous psychiatrist, to Plaintiff when he was reported to be extremely agitated on September 20, 2013;

E.  Discharging Plaintiff on September 20, 2013 while knowing him to be incapable of self-care;

F.  Discharging Plaintiff on September 20, 2013, while knowing him to be nearly immobile;

G.  Discharging Plaintiff on September 20, 2013 while knowing he was homeless;

18

H.    Discharging Plaintiff knowing that he had brain atrophy and likely permanent deficits making a legal guardian necessary.

I.    Discharging Plaintiff while also recommending 1:1 observation for Plaintiff's safety.

131.   Defendant Reading Health System is vicariously liable for the negligent acts of Defendant Doomra, its agent.

132.   The negligence of Defendant Doomra consists of the following:

A.    Failure to place Plaintiff on the Hospital's standard Alcohol Withdrawal Protocol upon admission on September 9, 2013;

B.    Failure to diagnose and effectively treat alcohol withdrawal in Plaintiff by eliminating Ativan from his prescribed medications only one day after he began the alcohol withdrawal protocol on September 14, 2013;

C.    Failure to recognize signs of delirium tremens.

133.   Said acts and/or omissions by Defendants breached the standard of care reasonably expected of a psychiatrist and/or hospitalist in a similar situation.

134.   Said acts and/or omissions by Defendants created a reasonably foreseeable risk of the kind of injuries suffered by Plaintiff. Plaintiff's injuries include:

A.    Continuing grand mal seizures related to his alcohol withdrawal, which occurred after his discharge from the Hospital on September 20, 2013.

B.    Two hundred days of incarceration for a manifestation of the agitation and confusion that accompanies the illness he went to the Hospital to cure.

C.    Severe physical pain, suffering, mental anguish, humiliation, and loss of reputation all of which may continue for an indefinite period of time in the future.

19

135. Said acts and/or omissions by Defendants were the proximate cause of Plaintiff's injuries as detailed above

WHEREFORE, Plaintiff prays that the Court grant relief by

- Declaring that the acts and practices complained of herein are medical negligence,

- Entering judgment against Defendants in an amount to be determined,

- Awarding compensatory and/or special damages for all losses Plaintiff has suffered or may suffer due to the conduct of Defendant's agents,

- Awarding punitive damages to the extent allowed under the law,

- Awarding Plaintiff the costs of litigation and reasonable attorneys' fees, and

- Granting any other relief the Court may find to be just and proper, including equitable and injunctive relief.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, both jointly and severally, in an amount deemed fair, just and equitable, and damages in excess of $150,000 exclusive of interests an costs.

Respectfully submitted,

Christopher B. Connard, Esquire
Mays, Connard & Rotenberg
Attorney I.D. No. 201749
1235 Penn Avenue, Suite 202
Wyomissing, Pa. 19610
610-400-0481
Dated: September 21, 2015          Attorney for Plaintiff James N. Hollinger

20