**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES N. HOLLINGER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| | : | |
| **READING HEALTH SYSTEM, et al.,** | : | **NO. 15-5249** |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM**

Stengel, J.                                                          **July14th, 2016**

Plaintiff James Hollinger filed this complaint against Defendant Reading Health System, d.b.a. Reading Hospital ("RHS"), Sachin Shrestha, M.D., Robert Jenkins, M.D. Shikha Doomra, M.D., and Reading Hospital and Medical Center ("Hospital"), alleging the following claims:  (1) failure to stabilize in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA") against RHS and the Hospital (Count One); (2) failure to screen in violation of EMTALA against RHS and the Hospital (Count Two); (3) discrimination in violation of Title III of the Americans with Disabilities Act ("Title III") against RHS and the Hospital (Count Three); (4) discrimination in violation of § 504 of the Rehabilitation Act of 1973 ("§ 504") against RHS and the Hospital (Count Four); and (5) negligence against RHS, the Hospital, Dr. Shrestha, Dr. Jenkins and Dr. Doomra (Count Five).  The defendants filed a motion to dismiss the plaintiff's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the

reasons discussed herein, I am dismissing with prejudice the plaintiff's failure to screen and failure to stabilize EMTALA claims, and dismissing without prejudice the plaintiff's Title III and § 504 claims.  I am denying the defendants' motion to dismiss Hollinger's negligence claim.

## I.      BACKGROUND

On September 9, 2013, 63-year-old James Hollinger was found unresponsive and incontinent of stool on the porch of the building from which he had been evicted.  Pl.'s Am. Compl. ¶¶ 15-16.  According to witnesses, Hollinger had suffered a grand mal seizure.  Id. at ¶ 17.  EMS transported Hollinger to the emergency room of the Hospital where Dr. Kara Mischler admitted and treated him.  Id. at ¶ 18.  While in the emergency room, Hollinger continued to suffer seizures and Dr. Mischler noted that Hollinger was also experiencing confusion and loss of consciousness.  Id. at ¶¶ 19, 21.  Suspecting that the seizures were due to alcohol withdrawal, Dr. Mischler consulted with the trauma department.  Id. at ¶ 20.  Hollinger was given a CT scan which radiologist Dr. Brent Wagner interpreted.  Id. at ¶ 22.  Dr. Wagner stated that Hollinger's CT scan showed "advanced atrophy unusual for his age and chronic microvascular ischemia, which are indicative of small strokes."  Id. at ¶ 23.

That same day, September 9th, Hollinger was transferred from the trauma bay, admitted as an in-patient at the Hospital and assigned to attending physician Dr. Doomra. Id. at ¶¶ 24, 29.  After his transfer, Nurse Judy Kilduff stated that Hollinger was alert but was "hollering obscenities" and refused to answer her questions.  Id. at ¶ 25.  On

September 10th, neurologist Dr. Sowmya Lakshminarayanan evaluated Hollinger. <u>Id.</u> at ¶ 26.  Dr. Lakshminarayanan noted that Hollinger had no new neurological complaints but was unable to remember the events transpiring right before his admission to the Hospital. <u>Id.</u> at ¶ 27.  Additionally, Hollinger continued to use obscenities and was concerned about getting home to his newly adopted German Shepard puppy. <u>Id.</u>  Dr. Lakshminarayanan concluded that Hollinger's seizures were most likely due to alcohol withdrawal. <u>Id.</u> at ¶ 28.

At this point, both Dr. Mischler and Dr. Lakshminarayanan had concluded that Hollinger was suffering from alcohol withdrawal; however, the Hospital's Alcohol Withdrawal Protocol was still not imitated. <u>Id.</u> at ¶¶ 30-31.  It was not until September 14th, when a nurse went to Dr. Shailaja Amirshetty and told Dr. Amirshetty her concerns regarding Hollinger's ongoing agitation that Hollinger was given an increased dose of Ativan. <u>Id.</u> at ¶¶ 32-33.  The next day Dr. Doomra discontinued Hollinger's use of Ativan for alcohol withdrawal. <u>Id.</u> at ¶ 34.

Although Hollinger's seizures stopped, he continued to experience agitation, mobility problems, delirium and impaired cognition. <u>Id.</u> at ¶ 35.  Because of his continuing symptoms, Hollinger was unable to care for himself or to make decisions, and staff members consistently assessed him as unsafe for discharge. <u>Id.</u> at ¶ 40.  Throughout his stay, Hollinger stated that he needed to return to his home to take care of his dog. <u>Id.</u> at ¶ 38.  Hospital staff members confirmed that Hollinger's home had been foreclosed upon and his dog had been dead for more than a year. <u>Id.</u>  Staff members related these

3

delusions to the treating physicians.  Id. at ¶ 39.  Additionally, Hollinger was suffering

acute symptoms of dysfunction related to mobility.  Id. at ¶ 40.  Hollinger was unable to

walk independently and fell twice during his hospital stay.  Id. at ¶¶ 42-43.  Alarms were

placed on his bed and chair to insure that staff would be notified if he moved.  Id. at ¶ 44.

On September 18th, Nurse Erin Lender noted that Hollinger continued to be in

danger of falling and was "confused at times to surroundings."  Id. at ¶ 46.  Because of

this, Nurse Lender had Hollinger's bed moved closer to the nursing station so that

Hollinger could be monitored.  Id. at ¶ 47.  On the morning of September 19th, Hollinger

went to physical therapy with Teresa Feiler, MSPT.  Feiler noted that Hollinger was still

agitated, confused, and unsafe to discharge, and had fixated on finding cigarettes which

he had purchased but could not find "in his [apartment] yesterday when he was there."

Id. at ¶¶ 49-50.  Later that day, social worker Bonnie Werley, ACBSW, evaluated

Hollinger and concluded that she did not feel that it was safe for Hollinger to be sent

home despite his continued requests to return home.  Id. at ¶ 51.  Werley recommended

that the Hospital seek a court-appointed guardian for Hollinger because she felt that he

was incapable of making decisions and she had already made several unsuccessful efforts

to locate a power of attorney for Hollinger.  Id. at ¶ 54.  Moreover, Werley stated that

Hollinger was "unsteady on his feet and not safe to get around on his own."  Id. at ¶ 55.

Werely also recommended that Hollinger be placed in a skilled nursing facility.  Id. at ¶

56.

4

In the early hours of September 20th, Nurse Aimme Crisco noted that Hollinger had begun to try to hit staff members and had insisted on going to the refrigerator.  Id. at ¶ 57.  Over the course of the morning, Hollinger became increasingly agitated, disoriented and combative.  Id. at ¶ 58.  Nurse Lydia Davis paged Dr. Shrestha to let Dr. Shrestha know of Hollinger's condition, but Dr. Shrestha did not issue any new orders to treat the increased aggressiveness which Hollinger was displaying.[1]  Id. at ¶ 59.  That afternoon, Hollinger slapped Nurse Davis across the face with an open hand.  Id. at ¶ 63.  Hollinger was not fully ambulatory at the time and after slapping Nurse Davis, Hollinger fell over.  Id. at ¶ 65.  Hospital security responded and called the West Reading Police Department.  Id. at ¶ 66.  According to the amended complaint, Hospital Security requested that Hollinger be evaluated for discharge to facilitate Hollinger's transfer into police custody.  Id. at ¶ 67.

Dr. Shrestha requested that a psychiatrist reevaluate Hollinger.  Id. at ¶ 77. Defendant Dr. Robert Jenkins reviewed the progress notes on Hollinger and spoke with Dr. Shrestha.  Id. at ¶ 78.  Dr. Jenkins had not previously treated or evaluated Hollinger during his hospitalization.  Id. at ¶ 82.  Dr. Jenkins concluded that Hollinger's delirium had resolved, but that he was "at high risk of violent behavior and 1:1 observation is recommended for safety."  Id. at ¶ 80.  Despite this conclusion, Dr. Jenkins stated that Hollinger "possesses capacity to make his own medical decisions."  Id. at ¶ 81.

---

[1] Hollinger had seen psychiatrist Dr. Zahid Awan, on September 10th and Dr. Awan had recommended a dose of Haldol in the event that Hollinger became aggressive with staff.  Id. at ¶ 60.

At 7:28 p.m. on September 20th, the same day Hollinger slapped Nurse Davis, Dr. Shrestha discharged him from the Hospital with approval from Dr. Jenkins.  Id. at ¶ 88. Dr. Shrestha's discharge summary described Hollinger's deliriums as "resolved" and noted that he was now capable of making a decision regarding his discharge.  Id. at ¶ 89. Dr. Shrestha's summary made no reference to Hollinger's mobility issues or the physical therapy that Hollinger was undergoing.  Id. at ¶ 91.  Hollinger's discharge instructions advised him to follow up with a primary care physician and "highlighted a recommended change in [his] Ativan treatment."  Id. at ¶ 96.  Hollinger did not leave the Hospital with medication to control his seizures or his agitation.  Id. at ¶ 97.

After his discharge, West Reading police escorted Hollinger from the Hospital in a wheelchair to the Berks County Prison ("BCP").  Id. at ¶¶ 93, 99.  Police charged Hollinger, who had no prior criminal history, with aggravated assault, a second degree felony.  Id. at ¶¶ 98, 109.  Shortly after Hollinger's arrival at BCP, he began to suffer grand mal seizures again.  Id. at ¶ 99.  However, medical staff did not attend to Hollinger until September 21st.  Id. at ¶ 101.  BCP medical staff placed Hollinger in suicide restraints and diagnosed him with alcohol withdrawal.  Id. at ¶¶ 103-104.  BCP continued to prescribe Ativan for Hollinger.  Id. at ¶ 105.  Hollinger reported to BCP that he had been held captive in a basement prior to his incarceration.  Id. at ¶ 106.  Hollinger was held at BCP for more than 200 days.  Id. at ¶ 108.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Following the Supreme Court decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleading standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to allege facts sufficient to show that the plaintiff has a "plausible claim for relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  A facially plausible claim may not be supported by conclusory allegations, but must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

When presented with a motion to dismiss for failure to state a claim under Rule 12(b)(6), district courts should conduct a two-part analysis.  Fowler, 578 F.3d at 210.  First, the court must separate the factual and legal elements of the claim.  Id.  The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  Id.  Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim of relief."  Id. (citing Iqbal, 556 U.S. at 678).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the plaintiff is entitled to relief." Iqbal, 556

U.S. at 677-78. While Federal Rule of Civil Procedure 8(a)(2) does not require the plaintiff to plead detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678. In other words, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Moreover, a pleading is not sufficient if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id.

## III.   DISCUSSION

The defendants move to dismiss the plaintiff's amended complaint pursuant to Rule 12(b)(6) on the basis that: (1) all the claims against the Hospital are time-barred; (2) the plaintiff cannot sustain a lack of screening or stabilization claim under EMTALA on the facts as alleged; and (3) the plaintiff's Title III and § 504 claims are simply medical professional liability claims reworked as federal claims. The defendants also challenge the sufficiency of the plaintiff's negligence claim and the validity of the plaintiff's request for punitive damages and attorneys' fees.

### A.   Statute of Limitations

#### 1.   The Hospital

The defendants argue that all of the plaintiff's claims against the Hospital are time-barred and therefore, must be dismissed. The statute of limitations is an affirmative defense; however, "it may be raised in a motion to dismiss where the plaintiff's failure to comply with the limitations period is apparent from the face of the pleadings." Datto v. Harrison, 664 F.Supp.2d 472, 482 (E.D. Pa. 2009). A plaintiff filing an EMTALA claim

8

must file his complaint within two years of his alleged EMTALA injury.  42 U.S.C. §

1395dd(d)(2)(C).  Title III and § 504 do not set forth an express statute of limitations for

claims arising under them.  Therefore, the applicable statute of limitations is "determined

by looking to the limitations period for the most analogous cause of action in the state in

which it sits."  Datto, 664 F.Supp.2d at 482.  Claims under Title III and § 504 are best

characterized as personal injury claims.  See Disabled in Action of Pa. v. Se. Pa. Trans.

Auth., 539 F.3d 199, 208 (3d Cir. 2008)(holding that § 504 claims are subject to the

statute of limitations for personal injury actions); Soignier v. Am. Bd. of Plastic Surgery,

92 F.3d 547, 551 (7th Cir. 1996)(clarifying that claims under Title III are correctly

classified as personal injury claims).  In Pennsylvania, personal injury actions are subject

to a two-year statute of limitations.  42 Pa. Cons. Stat. § 5524.  Therefore, like his

EMTALA claims, Hollinger's claims under Title III and § 504 are subject to a two-year

statute of limitations.  State law claims for negligence also fall within the scope of the

two year statute of limitations set forth in § 5524.  Floyd v. Brown & Williamson

Tobacco Corp., 159 F.Supp.2d 823, 828-29 (E.D. Pa. 2001).  Therefore, all of Hollinger's

claims against the Hospital must have been brought within two years of his alleged injury

in order to survive.

     According to the defendants, Hollinger's claims against the Hospital arose on

September 20, 2013, when Hollinger was discharged from the Hospital.  Hollinger filed a

complaint against RHS on September 21, 2015 but did not assert claims against the

Hospital at that time.[2]  It was not until December 8, 2015, the date on which Hollinger filed an amended complaint, that Hollinger asserted his claims against the Hospital as well as RHS.  The defendants contend that the claims asserted against the Hospital in Hollinger's December 8th amended complaint are several months past the two-year statute of limitations and therefore, are time-barred.

Hollinger argues that the claims in his amended complaint relate back to the claims set forth in his original complaint.  I agree.  Rule 15(c) of the Federal Rules of Civil Procedure sets forth three distinct requirements for an amendment of a complaint to relate back to the original complaint:

> (1) The claims in the amended complaint must arise out of the same occurrences set forth in the original complaint, (2) the party to be brought in by amendment must have received notice of the action within 120 days of its institution, and (3) the party to be brought in by amendment must have known, or should have known, that the action would have been brought against the party but for a mistake concerning its identity.[3]

---

[2] September 21, 2015 was a Monday.  Rule 6 of the Federal Rules of Civil Procedure states:
>(a) Computing Time. The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time.
>(1) Period Stated in Days or a Longer Unit.  When the period is stated in days or a longer unit of time:
>(C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

Fed. R. Civ. P. 6(a)(1)(C).

[3] When an Amendment Relates Back.  An amendment to a pleading relates back to the date of the original pleading when:
>>(A) the law that provides the applicable statute of limitations allows relation back;
>>(B) the amendment asserts a claim or defense that arouse out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

<u>Arthur v. Maersk, Inc.</u>, 434 F.3d 196, 203 (3d Cir. 2006)(citing Fed. R. Civ. P. 15(c)).

Rule 15(c) requires a party seeking relation back of an amended complaint to satisfy all

three requirements.  <u>Singletary v. Pa. Dept. of Corr.</u>, 266 F.3d 186, 195 (3d Cir. 2001).

To satisfy the third prong, a party seeking relation back may claim actual notice or may

impute notice by two methods:  "(i) the existence of a shared attorney between the

original and proposed new defendant; and (ii) an identity of interest between these two

parties."  <u>Id.</u> at 189.  The "shared attorney" method is premised on the notion that when

the parties sought to be added are represented by the same attorney, "the attorney is likely

to have communicated to the latter party that he may very well be joined in the action."

<u>Garvin v. City of Phila.</u>, 354 F.3d 215, 222-23 (3d Cir. 2003)(citing <u>Singletary</u>, 266 F.3d

at 196).  The "identity of interest" method "generally means that the parties are so closely

related in their business operations or other activities that the institution of an action

against one serves to provide notice of the litigation to the other."  <u>Id.</u> at 223 (citing

<u>Singletary</u>, 266 F.3d at 197).

---

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P.  15(c).

The defendants argue that Hollinger is not permitted to add a new party under Rule 15.  Rather, the defendants contend that Rule 15 contemplates only substituting one party for another and not, as Hollinger attempts to do here, add a new distinct party.  I decline to adopt such a restrictive view.  See Atlantic Pier Associates, LLC v. Boardakan Rest. Partners, LP, No. CIV.A.08-4564, 2010 WL 3431875, *6 (E.D. Pa. Aug. 30, 2010)("While the text of Rule 15(c) suggests that the mistake element only applies to misnamed or mis-described parties, the Rule is widely-understood to allow the addition of new parties that were never originally named or described.").  Hollinger's claims against both RHS and the Hospital arise from the same occurrence, specifically his visit to the Hospital and his subsequent treatment there.  The defendants do not dispute that the Hospital received notice of Hollinger's action within 120 days of the plaintiff's original complaint.  As for the third prong of Rule 15(c), the shared attorney method of notice applies here.  The attorney representing RHS also represents the Hospital and thus, it is reasonable to assume that the attorney is likely to have communicated to the Hospital that it may very well be joined in this action.  All three requirements under Rule 15(c) have been met here and therefore, I find that the amended complaint adding the Hospital relates back to Hollinger's original complaint.  Because Hollinger's amended complaint relates back to the original complaint which was filed within the statute of limitations, his claims against the Hospital are not time-barred.

### 2.   Dr. Doomra

Additionally, the defendants claim that Hollinger's negligence action against Dr. Doomra was brought outside of the two-year statute of limitations for negligence actions and therefore, must be dismissed as time-barred.  Hollinger filed his complaint on September 21, 2015.  The defendants explain that Hollinger's amended complaint contains the following allegations against Dr. Doomra:

> The negligence of Defendant Doomra consists of the following:
>
> A.  Failure to place Plaintiff on the Hospital's standard Alcohol Withdrawal Protocol upon admission on September 9, 2013;
>
> B.  Failure to diagnose and effectively treat alcohol withdrawal in Plaintiff by eliminating Ativan from his prescribed medications only one day after he began the alcohol withdrawal protocol on September 14, 2013;
>
> C.  Failure to recognize signs of delirium tremens.

Pl.'s Am. Compl. ¶ 173 (A)-(C).  Medical negligence actions have a two-year statute of limitations in Pennsylvania.  42 Pa. Cons. Stat. Ann. § 5524(2).  The defendants point out that none of the allegations against Dr. Doomra assert that she saw Hollinger after September 14, 2013 or the following day.  Defs.' Mot. 23.  Therefore, Pennsylvania's two-year statute of limitations bars Hollinger's negligence action against Dr. Doomra.

A Rule 12(b)(6) motion may raise a statute of limitations defense "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)(citations omitted).  However, "[i]f the bar is not apparent on the face of the

complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." Id. (citing Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002)).  Here, it is apparent on the face of the complaint that Hollinger's claims against Dr. Doomra for failure to place him on the Alcohol Withdrawal Protocol on September 9, 2013 and for failure to effectively treat his alcohol withdrawal on September 14, 2013 are time-barred.[4]  Accordingly, Hollinger may not bring a negligence action against Dr. Doomra on the basis of these facts.  However, Hollinger also alleges that Dr. Doomra was negligent for failure to recognize signs of delirium tremens.  It is not clear on the face of the complaint whether the statute of limitations bars Hollinger's negligence claim against Dr. Doomra for failure to recognize signs of delirium tremens.  It is certainly possible the alleged failure to recognize signs of delirium tremens occurred with the statute of limitations.  Therefore, I will not yet dismiss Dr. Doomra from this action.

### B.   EMTALA

In the mid-1980s, Congress enacted EMTALA to address growing concerns about "patient dumping," a practice where hospitals would refuse to treat certain emergency room patients or would transfer them to other institutions for treatment. Torretti v. Main Line Hospitals, Inc., 580 F.3d 168, 173 (3d Cir. 2009)(citing 68 F.R. 53,222, 53,223 (Sept. 9, 2003)).  EMTALA requires that hospitals provide appropriate medical screening and stabilizing treatment in a nondiscriminatory manner to any individuals seeking

---

[4] The plaintiff responds that the discovery rule applies here to toll the statute of limitations.  According to the plaintiff, he was "unaware of his surroundings, concerned about his dead dog and eager to return to a home that had been foreclosed."  Pl.'s Resp. 23.  I decline to apply the discovery rule here to toll the statute of limitations.

emergency care.[5]  <u>Byrne v. Cleveland Clinic</u>, 519 F.App'x 739, 742 (3d Cir. 2013);

<u>Toretti</u>, 580 F.3d at 172 ("EMTALA requires hospitals to give certain types of medical

care to individuals presented for emergency treatment:  (a) appropriate medical screening,

(b) stabilization of known emergency medical conditions and labor, and (c) restrictions

on transfer of unstabilized individuals to outside hospital facilities.").  However, courts

have consistently emphasized that EMTALA "does not . . . create a federal cause of

action for malpractice."  <u>Delibertis v. Pottstown Hosp. Co. LLC</u>, No. CIV.A.14-6971,

2016 WL 245310, *3 (E.D. Pa. Jan. 21, 2016)("[L]iability [under EMTALA] is

determined independently of whether any deficiencies in the screening or treatment

provided by the hospital may be actionable as negligence or malpractice.").

---

[5] The statute states in relevant part:

> (a) Medical screening requirement
>
> In the case of a hospital that has a hospital emergency department, if any individual . . .comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . .to determine whether or not an emergency medical condition . . .exists. . .
>
> (b) Necessary stabilizing treatment for emergency medical conditions and active labor
>
> (1) In general[:] If any individual  . . .comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C § 1395dd(a)-(b).

### 1.      Failure to Screen

Section 1395dd(a) of EMTALA states that hospitals are required to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists."  42 U.S.C. § 1395dd(a).  EMTALA does not define "appropriate medical screening," but "circuit courts have interpreted the statute as requiring hospitals to provide uniform screening to all those who present substantially similar complaints." Blake v. Main Line Hospitals, Inc., No. CIV.A.12-3456, 2014 WL 1345973, *3 (E.D. Pa. Apr. 3, 2014)(citations omitted).  This provision governs only the application of screening procedures not the development of them.   Kauffman v. Franz, No.CIV.A.07-5043, 2009 WL 3157333, *2 (E.D. Pa. Sept. 25, 2009)("Hospitals may develop their own screening procedures; EMTALA requires that hospitals apply those procedures even-handedly to all patients.").  Again, EMTALA is not a substitute for state law malpractice actions; therefore, the key inquiry in evaluating a failure to screen claim under EMTALA is not whether the screening resulted in the correct diagnosis but whether the hospital "appl[ied] its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay." Davis v. Twp. of Paulsboro, 424 F.Supp.2d 773, 779 (D.N.J. 2006)(emphasis in the original); Blake, 2014 WL 1345973, at *3 ("Crucial to any screening claim, the plaintiffs must allege that the hospital [failed to] apply its standard of screening uniformly to all emergency room patients.").

Hollinger asserts a failure to screen claim against the Hospital under EMTALA alleging that Dr. Jenkins' and Dr. Shresthra's screening prior to Hollinger's discharge was "not calculated to identify an emergency condition," but instead, was performed to "provide cover for Defendant's colleagues who wanted Plaintiff off their ward."  Pl.'s Resp. 11-12.  Hollinger alleges his failure to screen as follows:

> On information and belief, the screening performed by Defendants' agent Jenkins on Plaintiff was not a screening of the nature of quality that the Hospital uniformly provides to other patients presenting with substantially similar complaints.

> On information and belief, the screening performed by Defendants' agent Shresthra was not a screening of the nature or quality that the Hospital uniformly provides to other patients presenting with substantially similar complaints.

Pl.'s Am. Compl. ¶¶ 143, 146.  Hollinger does not allege that his initial screening upon presenting at the emergency room was not performed much less that the emergency room's screening was not uniformly applied to him.  Rather, Hollinger's failure to screen claim is based upon the "screening" which Dr. Jenkins and Dr. Shresthra performed shortly before his discharge, eleven days after being admitted.  To preserve this claim would be to extend EMTALA's screening requirement far beyond the scope intended by Congress and reflected in the statutory language.  Hollinger has not demonstrated any persuasive legal authority indicating that the EMTALA screening requirement applies to a screening given outside of the emergency room.  Despite Hollinger's characterization of this case as one of "patient dumping," there is no factual basis for this characterization. Hollinger does not allege that he was turned away from the emergency room, or even that

the emergency room treatment was inadequate.  In fact, Hollinger makes no allegations whatsoever challenging the care he received in the emergency room.  The legislative history and statutory language are clear that EMTALA's screening requirement is limited to the emergency room.  Hollinger fails to allege that the screening performed in the emergency room was not uniformly applied.  Therefore, I will grant the defendants' motion to dismiss on this claim.

### 2.    Failure to Stabilize

An EMTALA "stabilization" claim occurs under 42 U.S.C. § 1395dd(b)(1) where the plaintiff "(1) had an emergency condition; (2) the hospital actually knew of that condition; and (3) the patient was not stabilized before being transferred."  Byrne v. Cleveland Clinic, 684 F.Supp.2d 641, 654 (E.D. Pa. 2010)(citations omitted).  EMTALA defines the "stabilization" requirement to mean that "with respect to an emergency medical condition . . . [a hospital must] provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility."  42 U.S.C § 1395dd(e)(3)(A).

The critical issue underlying Hollinger's stabilization claim is when EMTALA's stabilization requirement ends.  Under Hollinger's interpretation of EMTALA's stabilization requirement, the Hospital was not required to provide Hollinger indefinite treatment, but they were obligated to stabilize Hollinger before discharging him.  In other words, Hollinger argues that EMTALA's stabilization requirements extend beyond the

emergency room and continue to apply even after a patient is admitted as an in-patient. Hollinger cites to Sixth Circuit case law, namely Moses v. Providence Hosp. & Med. Centers, 561 F.3d 573 (6th Cir. 2009), as support for this interpretation of EMTALA's stabilization requirement.  In response, the defendants claim that EMTALA's stabilization requirement ends upon a patient's admission into the hospital.  Accordingly, the Hospital had no obligation under EMTALA to stabilize Hollinger after his eleven-day inpatient stay.  The defendants argue that broadening the scope of EMTALA's stabilization requirement beyond the emergency room would defeat the congressional intent behind enactment of the statute as it "transforms EMTALA into a federal medical malpractice statute."  Defs.' Reply 1.

Hollinger points to Moses as the most accurate guidance on this case.  In Moses, the patient was brought to the emergency room of Providence Hospital after he exhibited signs of physical and mental illness.  Moses, 561 F.3d at 576.  The emergency room physician admitted the patient into the hospital for more testing.  Id.  After six days, the patient was released and ten days after his release, the patient murdered a third party.  Id. at 577.  The plaintiff, a representative of the third party, asserted an EMTALA claim alleging that the hospital's decision to admit the patient did not satisfy its obligations under EMTALA.  The Sixth Circuit agreed with the plaintiff stating "a hospital may not release a patient with an emergency medical condition *without first determining that the patient has actually stabilized*, even if the hospital properly admitted the patient."  Id. at 583 (emphasis in the original).  Thus, the Sixth Circuit denied the defendants' motion for

summary judgment holding that "the hospital was required under EMTALA not just to admit [the patient] into the inpatient care unit, but to *treat* him in order to stabilize him" before discharging him.  Id. at 584.

The defendants argue that Moses conflicts with the majority of court opinions. Rather, the defendants urge me to adopt a more widely embraced interpretation of EMTALA which holds that a hospital's EMTALA stabilization obligations are satisfied once the patient is admitted.  See Bryant v. Adventist Health Sys./West, 289 F.3d 1162, 1168 (9th Cir. 2002)("We hold that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care."); Bryan v. Rectors and Visitors of Univ. of Va., 95 F.3d 349, 350 (4th Cir. 1996)("[The plaintiff's] essential contention is that EMTALA imposed upon the hospital an obligation not only to admit [the patient] for treatment of her emergency condition, which concededly was done, but thereafter continuously to 'stabilize' her condition, no matter how long treatment was required to maintain that condition.  Such a theory requires a reading of the critical stabilization requirement in subsection (b)(1) of EMTALA that we cannot accept."); James v. Jefferson Reg'l, No. Civ.A.12-267, 2012 WL 1684570, *3 (E.D. Mo. May 15, 2012)("Rejecting the analysis in Moses, the Court holds that a hospital meets its obligations under EMTALA once it admits a patient.").

Although the Third Circuit has not yet addressed this specific issue, I believe that the court in Mazurkiewicz v. Doylestown Hosp., 305 F.Supp.2d 437 (E.D. Pa. 2004), set forth a detailed and instructive examination of the relevant case law and proves an

important guidepost for the instant case.[6]  In Mazurkiewicz, the plaintiff arrived at the emergency department of Doylestown Hospital with signs indicative of a right peritonsilar abscess.  Mazurkiewicz, 305 F.Supp.2d at 439.  The plaintiff was hospitalized for five days after which he was discharged.  Within twelve hours of his discharge, the plaintiff's condition worsened and the plaintiff went to another hospital's emergency department where he had to undergo emergency surgery.  The plaintiff filed a claim under EMTALA seeking to hold the first hospital liable because he had an emergency medical condition that was not "stabilized" prior to his discharge.  The Mazurkiewicz court examined case law from the Ninth, Fourth and Eleventh Circuits which declared that EMTALA failure to stabilize claims were not viable where the plaintiff was admitted into the hospital.  Bryan 95 F.3d at 349; Bryant, 289 F.3d 1162; Harry v. Marchant, 291 F.3d 767 (11th Cir. 2002).  The Mazurkiewicz court weighed the decisions of the Ninth, Fourth and Eleventh Circuits with case law from the Sixth Circuit holding that "once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room."  Thornton v. Sw. Detroit Hosp., 895 F.2d 1131 (6th Cir. 1990).  Ultimately, the Mazurkiewicz court adopted the reasoning of the Ninth, Fourth and Eleventh Circuits.  The Mazurkiewicz court dismissed the plaintiff's EMTALA claim concluding that the most "persuasive synthesis" of the case

---

[6] The plaintiff argues that Mazurkiewicz is distinguishable from this case "because it concerned the hospital's failure to detect an emergency condition that required a plaintiff to have surgery shortly after his discharge."  Pl.'s Resp. 6.  The plaintiff goes on to claim that this case is inapposite to Mazurkiewicz because "multiple staff members at Reading Hospital clearly knew that he suffered from unresolved emergency conditions at the time of his discharge."  Id.  I find this argument unpersuasive.  Neither Mazurkiewicz nor this case turns on the knowledge of the hospital staff members, but rather, whether EMTALA obligations extend past admission as an inpatient.

law, the legislative history of EMTALA and the statutory language is that "admission [of

a patient] is a defense so long as admission is not subterfuge." Mazurkiewicz, 305

F.Supp.2d at 447.

Although Hollinger urges me to extend the stabilization requirements of

EMTALA past the emergency room, I cannot reconcile such an interpretation with the

relevant case law and the legislative intent behind EMTALA. Bryan, 95 F.3d at 351

("Congress's sole purpose in enacting EMTALA was to deal with the problem of patients

being turned away from emergency rooms for non-medical reasons."). Rather, I will

adopt the interpretation of EMTALA's stabilization requirement as set forth in

Mazurkiewicz and will consider in-patient admission a defense to EMTALA liability

permitted that admission was not a deliberate effort to avoid EMTALA obligations. To

do otherwise would be to thwart the legislative intent behind EMTALA and would set

courts on the slippery slope of evaluating every medical decision through the lens of

EMTALA. This involves the use of EMTALA as a vehicle to raise medical malpractice

claims, a likely intrusion into an area that is appropriately governed by state law.

Like his failure to screen claim, Hollinger's failure to stabilize claim does not set

forth any allegations that he was turned away from the emergency room or that his care in

the emergency room was insufficient to meet EMTALA's stabilization requirements.

Hollinger alleges that:

> Defendants' staff were aware of Plaintiff's acute symptoms
> prior to his discharge on September 20, 2013 as Plaintiff's
> medical records are replete with references to his incapacity

22

> and inability to care for himself due to both physical and
> mental conditions.
>
> As a result of the actions of Defendants' agents, Plaintiff was
> discharged from the Hospital while suffering from multiple
> emergency medical conditions, in violation of EMTALA.

Pl.'s Am. Compl. ¶¶ 128, 133.  Clearly, the entirety of Hollinger's failure to stabilize claim relies upon Hollinger's discharge from the hospital after his eleven-day inpatient stay.  Hollinger has not alleged that his admission from the emergency room into the Hospital was subterfuge to avoid EMTALA obligations nor do his allegations indirectly support such a contention.  As I have adopted the reasoning of <u>Mazurkiewicz</u>, I am dismissing Hollinger's failure to stabilize claim.

### C.    <u>Title III of The Americans with Disabilities Act</u>

Hollinger also brings a claim against RHS and the Hospital under Title III of the Americans with Disabilities Act ("ADA") alleging that the defendants discriminated against him in the provision of public accommodations when they discharged him from the hospital on September 20, 2013. Hollinger seeks injunctive relief to require the defendants to stabilize all patients prior to discharge into law enforcement custody and to develop protocols governing administrative review of cases involving allegations of violence by patients seeking treatment for recognized disabilities.  The defendants move for dismissal of Hollinger's Title III claim stating that his allegations set forth a medical malpractice action rather than a Title III claim.

Title III of the ADA states that:

> No individual shall be discriminated against on the basis of
> disability in the full and equal enjoyment of goods, services,
> facilities, privileges, advantages or accommodations of any
> place of public accommodation by any person who owns,
> leases (or leases to), or operates a place or public
> accommodation.

42 U.S.C. § 12182(a).  Section 42 U.S.C. § 12182(b)(2)(A)(i)-(v) delineates the scope of

§ 12182(a) and defines discrimination as:

> A failure to make reasonable modifications in policies,
> practices, or procedures, when such modifications are
> necessary to afford such goods, services, facilities, privileges,
> advantages, or accommodations to individuals with
> disabilities, unless the entity can demonstrate that making
> such modifications would fundamentally alter the nature of
> such goods, services, facilities, privileges, advantages, or
> accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).  The plain meaning of this language requires a plaintiff

alleging a Title III claim to show that: "(1) he has a disability within the meaning of the

ADA; (2) he was discriminated against by defendant on the basis of that disability; (3) he

was thereby denied goods or services; and (4) the defendant owns, leases (or leases to), or

operates a place of public accommodation."  Haas v. Wyoming Valley Health Care Sys.,

465 F.Supp.2d 429, 433 (M.D. Pa. 2006).  42 U.S.C. § 12181(7) defines "a place of

public accommodation" and includes hospitals which affect interstate commerce. 42

U.S.C. §12181(7)(F).  Thus, a hospital is required under Title III of the ADA "to make

reasonable modifications to its policies, practices, and procedures where necessary to

ensure full and equal access to its services by disabled individuals."  Haas, 465 F.Supp.2d

at 435 (citing 42 U.S.C. § 12182(b)(2)(A)(ii)).

24

Hollinger's amended complaint alleges that he was disabled within the meaning of Title III as he suffered from alcoholism, brain atrophy and cognitive defects. [7]   Hollinger states that he was discharged because he slapped a nurse and that his actions against the nurse were a manifestation of his alcoholism.  Therefore, he was discharged because of his disability.  Hollinger states that "no reasonable accommodation or effort to treat the manifestations of his disability—such as providing the previously prescribed dose of Haldol—was made to permit his continuing care at Defendant Hospital."  Pl.'s Am. Compl. ¶ 158.  Accordingly, the denial of reasonable accommodations was a denial of services based on his disability in violation of Title III.

Although the defendants have not raised the issue of standing in their motion to dismiss, it is well within my discretion to address the issue of standing *sua sponte* and I find that it is appropriate to do so at this point.  McCormick v. Camp Pocono Ridge, Inc., 760 F.Supp. 1113, 1117 (M.D. Pa. 1991)("Although the plaintiff's standing has not been challenged by the defendants, the issue is jurisdictional and may be raised by the Court *sua sponte*.").  The "irreducible constitutional minimum of standing contains three elements."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  First, "the plaintiff must have suffered an injury in fact of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Garner v. VIST Bank, No. CIV.A.12-5258, 2013 WL 6731903, *4 (E.D. Pa. Dec. 20,

---

[7] "Although the Third Circuit has not squarely addressed whether alcoholism is a per se disability, the Third Circuit's approach to the question of disability in other cases leads the Court to believe that the Third Circuit would require the Plaintiff, in accordance with the express language of the ADA, to establish that his alcoholism substantially limits a major life activity."  Maull v. Div. of St. Police, Dept. of Public Safety, St. of De., 141 F.Supp.2d 463, 473 (D. Del. 2001).

2013)(citing Lujan, 504 U.S. at 560).  "Second, there must be a casual connection between the injury and the conduct complained of."  Lujan, 504 U.S. at 560.  "Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. at 561 (citations omitted).

Under Title III of the ADA, the only remedy available to a private plaintiff is prospective injunctive relief.  Reviello v. Phila. Fed. Credit Union, No. CIV.A.12-508, 2012 WL 2196320, *4 (E.D. Pa. June 14, 2012); Majocha v. Turner, 166 F.Supp.2d 316, 324 (W.D. Pa. 2001)("Other than attorneys fees, injunctive relief is the only relief available to plaintiffs under Title III of the ADA.").  Because prospective injunctive relief is the sole remedy available, "courts look beyond the alleged past violation and consider the possibility of future violations."  Shaika v. Gnaden Huetten Memorial Hosp., No. CIV.A.15-294, 2015 WL 4092390, *4 (M.D. Pa. July 7, 2015).  Thus, for purposes of establishing standing in an action for injunctive relief, "a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct."  Doe v. Nat'l Bd. of Med. Examiners, 210 F.App'x 157, 159-60 (3d Cir. 2006)("Past illegal conduct is insufficient to warrant injunctive relief unless it is accompanied by continuing, present adverse effects.")(citations omitted).

"[The plaintiff] must demonstrate a 'real and immediate threat' of injury in order to satisfy the 'injury in fact requirement.'"  Harty v. Burlington Coat Factory of Pa., L.L.C., No. CIV.A.11-1923, 2011 WL 2415169, *3 (E.D. Pa. June 16, 2011)(citations omitted).  A plaintiff seeking to meet his burden of showing a sufficient imminent injury

in a Title III ADA case may use one of two methods: the intent to return method or the

deterrent effect doctrine.  Garner, 2013 WL 6731903 at *4.  The intent to return method

requires a plaintiff to show that:

> (1) the plaintiff has alleged that the defendant engaged in past
> discriminatory conduct that violates the ADA; (2) it is
> reasonable to infer from allegations in the complaint that the
> discriminatory conduct will continue, and (3) it is reasonable
> to infer based on past patronage, proximity of the public
> accommodation to the plaintiff's home, business, or personal
> connections to the area, that the plaintiff intends to return to
> the public accommodation in the future.

Id. at *5; Heinzl v. Cracker Barrel Old Country Store, Inc., No. CIV.A.14-1455, 2015

WL 1925811, *8 (W.D. Pa. Apr. 24, 2015).  Under the deterrent effect doctrine, a

plaintiff has suffered an actual and imminent injury sufficient to confer standing where

the plaintiff was "deterred from patronizing a public accommodation because of a

defendant's failure to comply with the ADA."  Kratzer v. Gamma Mgmt. Grp., Inc., No.

CIV.A.04-6031, 2005 WL 2644996, *2 (E.D. Pa. Oct. 12, 2005).  A plaintiff seeking to

satisfy the deterrent effect doctrine "must show that he or she has actual knowledge of

barriers preventing equal access and a reasonable likelihood that the plaintiff would use

the facility if not for the barriers."  Garner, 2013 WL 6731903, at *6.

Hollinger's amended complaint states that he is entitled to prospective injunctive

relief because the Hospital discharged him on September 20, 2013 without attempting to

make reasonable accommodations for his disability.  Hollinger does not allege that he

may likely require future treatment at the Hospital or that the Hospital will likely

discriminate against him in the future because of his disability.  Nor does Hollinger allege

any facts which establish a reasonable likelihood that he would patronize the Hospital if

not for the barriers preventing equal access.  Hollinger's complaint is devoid of any

factual allegations demonstrating that Hollinger intends to return to the Hospital.

Hollinger's complaint alleges a single, isolated incident of past discriminatory conduct

which is not sufficient to meet requirements to establish standing under either the intent

to return method or the deterrent effect doctrine.  Heinzl, 2015 WL 1925811, at *10 ("It

is true that, even under the deterrent effect test, the plaintiff must still assert an intent to

return to the particular place or places where the violations are alleged to be occurring . .

.").  Hollinger is not entitled to prospective injunctive relief without a sufficient showing

that he is likely to suffer a future injury from the Hospital's allegedly discriminatory

conduct.  Anderson v. Macy's, Inc., 943 F.Supp.2d 531 (W.D. Pa. 2013)("A plaintiff's

intention to return to defendant's place of public accommodation 'some day' . . . without

any description of concrete plans, or indeed even any specification of when the some day

will be-do not support a finding of the requisite actual or imminent injury.").

Accordingly, I am dismissing Hollinger's Title III claim for lack of standing.

### D.   <u>Section 504 of the Rehabilitation Act</u>

Hollinger also claims that his discharge on September 20th after he struck a nurse

was in violation of § 504 of the Rehabilitation Act ("RA").  Section 504 of the RA, 29

U.S.C. § 794(a), provides as follows:

> No otherwise qualified individual with a disability in the
> United States, . . . shall solely by reason of her or his

28

> disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance . . .
> .

The plain meaning of this statutory language is to prohibit "federal agencies and private entities that receive federal funding from discriminating on the basis of disability . . . ." Kortyna v. Lafayette C., 47 F.Supp.3d 225, 238 (E.D. Pa. 2014). Given the similar language of the ADA and the RA, "the substantive standards for determining liability under § 504 of the RA are equivalent to the ADA, McDonald v. Dep't of Pub. Welfare, 62 F.3d 92, 94 (3d Cir. 1995), and claims under both provisions are interpreted consistently."[8] Langston v. Milton S. Hershey Med. Ctr., No. CIV.A.15-2027, 2016 WL 1404190, *6 (M.D. Pa. Apr. 11, 2016)(citing Emerson v. Thiel C., 296 F.3d 184, 189 (3d Cir. 2002); Shaika, 2015 WL 4092390, at *8 ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same.")(citing Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014)). However, unlike the ADA, a plaintiff bringing a claim under the RA is permitted to seek monetary relief including compensatory damages. A.W. v. Jersey City Pub. Schools, 486 F.3d 791, 804 (3d Cir. 2007).

Hollinger states that he was "effectively discharged from Defendant Hospital [for] manifesting the symptoms of his disabilities, including agitation and confusion," and that

---

[8] "In order to establish a claim under both the ADA and the RA, a plaintiff must show: "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability."
O'Guinn v. Nevada Dept. of Corr., 468 F.App'x 651, 652 (9th Cir. 2012).

"[i]n discharging [him], Defendant Hospital excluded [him] from a federally-funded program based on his disability."  Pl.'s Am. Compl ¶¶ 165-166.  Hollinger was "otherwise qualified to be at the Defendant Hospital; in fact, all Defendant Hospital staff members who reviewed his case as of September 20, 2013, had actively advocated for his continued stay."  Id. at ¶ 164.  According to the defendants, Hollinger's § 504 claim purports to contest the allegedly discriminatory conduct of the Hospital but in reality, questions Dr. Jenkin's determination that Hollinger possessed the capacity to make his own medical decisions and therefore, was capable of being discharged.   In other words, the defendants contend that Hollinger's § 504 claim is not legally viable because it essentially sets forth allegations demonstrating a medical malpractice action and therefore does not fall within the scope of Section 504.  Brown v. Ancora Psychiatric Hosp., No. CIV.A.11-7159, 2013 WL 4033712, *6 (D.N.J. Aug. 7, 2013)("Section 504 is not designed as a vehicle for asserting medical malpractice actions."); Watson v. A.I. DuPont Hosp. for Child. of Nemours Found., No. CIV.A.05-674, 2007 WL 1009065, *2 (E.D. Pa. Mar. 30 2007)("Defendants are correct insofar as they argue that § 504 should not be applied to medical treatment decisions.").

    I agree with the defendants that Hollinger's § 504 claim sounds in medical malpractice rather than discrimination.  The majority of allegations supporting Hollinger's § 504 claims challenge Dr. Jenkin's decision to discontinue treatment and Dr. Shrestha's discharge of Hollinger from the Hospital.  Although Hollinger attempts to frame his § 504 claim to demonstrate that Hollinger's disability was the motivating factor

behind Dr. Jenkin's decision to discontinue treatment and Dr. Shrestha's discharge of

Hollinger, the factual allegations as presented amount to no more than a failure to

adequately treat claim.  See Rosario v. Wash. Mem'l Hosp., No. CIV.A.12-1799, 2013

WL 2158584, *5 (W.D. Pa. May 17, 2013)("[S]uch denial of treatment claims under the

ADA and the RA simply do not state a claim upon which relief can be granted.").

Simply stated, the complaint fails to set forth sufficient factual allegations to demonstrate

that Hollinger was discriminated against and thereby discharged from the Hospital

because he manifested symptoms of his disability.  Despite alleging that his discharge

was pretext for disability discrimination in violation of § 504, Hollinger's amended

complaint contains only naked assertions and conclusory statements which are

insufficient to state a plausible claim of discrimination.  Accordingly, I am granting the

defendants' motion to dismiss

### E.    Negligence

The defendants argue that Hollinger's medical malpractice claim must be

dismissed pursuant to the Mental Health Procedure Act ("MHPA").  The MHPA grants

limited immunity to certain persons who provide treatment for mentally ill persons.  50

P.S. § 7101, et seq.  According to the defendants, the MHPA renders them immune from

civil liability "in the absence of willful misconduct or gross negligence . . . ." [9]  50 P.S. §

---

[9] 50 P.S. §  7114(a) states in full:

> In the absence of willful misconduct or gross negligence,
> a director of a facility, a physician, a peace officer or any other authorized
> person who participates in a decision that a person be examined or treated under
> this act, or that a person be discharged, or placed under partial hospitalization,
> outpatient care or leave of absence, or that the restraint upon such person be

7114(a).  The defendants state that neither Dr. Jenkins nor Dr. Shresthra acted with

willful misconduct or gross negligence and therefore, they are immune from liability

under the MHPA. [10]  In response, the plaintiff claims that his treatment does not fall

within the scope of the MHPA as his condition is specifically excluded from coverage

under the MHPA and he never alleged that he was committed to the psychiatric ward of

the Hospital.   Dismissal of Hollinger's medical malpractice claim on the basis of the

MHPA would be premature at this point.  Moreover, the plaintiff's amended complaint

presents sufficient factual allegations to establish a plausible claim for negligence.

Therefore, I will deny the defendants' motion to dismiss for failure to state a claim on

Hollinger's negligence claim.

### 1.        Punitive Damages

The defendants also move to dismiss Hollinger's claim for punitive damages on

the basis that he has failed to establish that the defendants acted with evil motive or with

reckless or callous indifference.  Under applicable Pennsylvania law, punitive damages

are appropriate "only in cases where the defendant's actions are so outrageous as to

---

> otherwise reduced, or a county administrator or other authorized person who
> denies an application for voluntary treatment or for involuntary emergency
> examination and treatment, shall not be civilly or criminally liable for such
> decision or for any of its consequences.

[10] The court in <u>Albright v. Abington Mem'l Hosp.</u>, 696 A.2d 1159, 1164 (Pa. 1997), addressed
MHPA liability stating:

> It appears that the legislature intended to require that liability be premised on
> facts indicating more egregiously deviant conduct than ordinary carelessness,
> inadvertence, laxity, or indifference.  We hold that the legislature intended the
> term gross negligence to mean a form of negligence where the facts support
> substantially more than ordinary carelessness, inadvertence, laxity, or
> indifference.  The behavior of the defendant must be flagrant, grossly deviating
> from the ordinary standard of care.

demonstrate willful, wanton or reckless conduct." <u>Hutchison v. Luddy</u>, 870 A.2d 766, 770 (Pa. 2005).  While ordinary negligence will generally not support an award of punitive damages, "punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured." <u>Id.</u> (citing Restatement (Second) of Torts § 908 (1979)).

Viewing the facts set forth in Hollinger's amended complaint as true and in the light most favorable to him, I find that Hollinger has sufficiently stated a claim for punitive damages against the defendants.  Although the facts may later prove at most that the defendants were merely negligent, discovery is necessary to make this determination.  Dismissing Hollinger's punitive damages claim at this stage would be premature.  Therefore, I will deny the defendants' motion to dismiss Hollinger's request for punitive damages.

### 2.    Attorneys' Fees

Finally, the defendants move to dismiss Hollinger's request for attorneys' fees on Count V on the grounds that no statutory basis exists for awarding attorneys' fees in medical malpractice cases in Pennsylvania.  Under Pennsylvania law, "a litigant cannot recover attorney's fees unless there is express statutory authorization, an agreement between the parties, or some other exception." <u>Option One Mortg. Corp. v. Fitzgerald</u>, 687 F.Supp.2d 520, 528 (M.D. Pa. 2009)(citing <u>Trizechahn Gateway v. Titus</u>, 976 A.2d 474, 482-83 (Pa. 2009)).  There is no express statutory authorization allowing a plaintiff

to recover attorneys' fees in a negligence action and Hollinger has not alleged that there is an agreement between the parties or some other exception which might permit attorneys' fees. Therefore, I am dismissing Hollinger's request for attorneys' fees on Count V.

## IV.   CONCLUSION

I am granting the defendants' motion to dismiss Hollinger's failure to screen, failure to stabilize, Title III and § 504 claims in addition to Hollinger's request for attorneys' fees under Count Five. I am denying the defendant's motion to dismiss the Hollinger's negligence claim and request for punitive damages. Rule 15 of the Federal Rules of Civil Procedure mandates that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). I will permit Hollinger leave to amend his Title III and § 504 claims, but I am dismissing with prejudice the failure to screen and failure to stabilize claims on the basis that permitting leave to amend would be futile. <u>Shane v. Fauver</u>, 213 F.3d 113, 115 (3d Cir. 2000)("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."). Hollinger cannot present any set of factual allegations regarding his treatment on September 20, 2013 that would state a legally viable claim for relief under EMTALA. The plaintiff shall have twenty days to submit an amended complaint.

An appropriate Order follows.