**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES N. HOLLINGER** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| | : | |
| **READING HEALTH SYSTEM, et al.,** | : | **NO. 15-5249** |
| | : | |
| **Defendants.** | | |

**M E M O R A N D U M**

**STENGEL, J.**                                        **January 30, 2017**

## I.      INTRODUCTION

Ten days into his stay as a patient at Reading Hospital, James Hollinger slapped Lydia Davis (one of the hospital's nurses) in the face. Plaintiff was discharged into police custody and charged with assault. He now sues the hospital and doctors that treated him.

He claims his discharge violated the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (RA) because he is an alcoholic and has related health conditions. While plaintiff's allegations certainly highlight the despondency of alcoholism, they do not present a cognizable claim under either the ADA or RA. Defendant filed a motion to dismiss plaintiff's second amended complaint. I will grant the motion.

## II.     FACTUAL BACKGROUND

On September 9, 2013, the plaintiff, James Hollinger, was admitted to Reading Hospital and Medical Center as a result of alcohol-related seizures. (Doc. No. 36 ¶¶ 15–

20). While at the hospital, plaintiff underwent a CT scan of his brain, which revealed atrophy and ischemia. (Id. ¶¶ 22–23). The same day he was admitted, plaintiff began screaming obscenities at hospital staff and refusing to answer their questions. (Id. ¶ 25).

Doctors concluded that plaintiff's seizures were due to alcohol withdrawal. (Id. ¶ 30). After being at the hospital several days and displaying "ongoing agitation," the hospital started plaintiff on its alcohol withdrawal protocol. (Id. ¶ 32). Doctors increased plaintiff's dose of Ativan in an attempt to alleviate his agitation. (Id. ¶ 33). Throughout his stay, plaintiff showed signs of mental deterioration and memory loss. (Id. ¶¶ 37–40). He was unsteady on his feet and fell several times. (Id. ¶¶ 40–43).

Psychiatric staff at the hospital recommended that plaintiff be provided one-on-one nursing care. (Id. ¶ 44). Consequently, hospital staff placed alarms on his bed so that they would know if he moved. (Id.) A week into plaintiff's hospital stay, staff continued to note plaintiff's confusion. (Id. ¶ 46). Plaintiff began trying to get out of his bed and became "very impulsive." (Id. ¶ 47). His confusion and disorientation at this time led a social worker to conclude that he was not ready to be discharged. (Id. ¶¶ 51–55). The social worker recommended appointing a legal guardian for plaintiff and placing him in long-term nursing care. (Id. ¶¶ 54–56).

Around midnight on September 20, 2013, plaintiff began trying to hit staff members. (Id. ¶ 62). A hospital psychiatrist recommended treating plaintiff with Haldol (an antipsychotic drug) because of his aggression toward staff. (Id. ¶ 65). After continually attempting to hit staff members, plaintiff was eventually successful when he slapped Lydia Davis, a hospital nurse, in the face. (Id. ¶ 67).

2

As a result of plaintiff slapping Ms. Davis in the face, hospital staff called the West Reading Police Department. (Id. ¶ 71). Based on their investigation, the police determined that plaintiff could be charged with assault. (Id. ¶ 72). The hospital requested that plaintiff be evaluated for discharge and taken into police custody. (Id. ¶ 73).[1]

Dr. Robert Jenkins, M.D., evaluated plaintiff for discharge. (Id. ¶ 91). Dr. Jenkins reviewed plaintiff's recent progress notes, spoke with Dr. Sachin Shrestha, M.D., and evaluated plaintiff personally. (Id.) Based on his observations, Dr. Jenkins concluded that plaintiff's delirium had improved but that he continued to be "at high risk of violent behavior." (Id. ¶ 94). Dr. Jenkins opined that plaintiff was capable of making his own medical decisions. (Id. ¶ 95). Dr. Shrestha, who had also treated plaintiff, agreed with these observations. (Id. ¶ 103). Plaintiff was discharged the evening of September 20, 2013. (Id. ¶ 102).

The hospital gave plaintiff discharge instructions, directing him to follow-up with his primary care physician and continue taking Ativan. (Id. ¶¶ 111–12). After arriving at the Berks County Prison, plaintiff was prescribed Ativan and placed in suicide restraints. (Id. ¶¶ 119–121). He was eventually charged with aggravated assault for hitting Ms. Davis and spent over 200 days in the prison, where he continued to suffer from alcohol withdrawal symptoms. (Id. ¶¶ 114–124).

After plaintiff was released from the Berks County Prison, he continued to experience more seizures and other health issues. (Id. ¶¶ 132–33). Plaintiff currently lives

---

[1] As noted in the second amended complaint, under 18 Pa. C.S. § 2702, a hospital patient may be charged with aggravated assault for actions that can be reasonably interpreted as an attempt to injure an emergency healthcare worker. (Doc. No. 36 ¶ 78).

in Reading, Pennsylvania. (Id. ¶ 134). The closest emergency room to plaintiff is Reading Hospital. (Id.) There is a different nearby emergency room also located in Berks County. (Id. ¶ 149).

## III.   PROCEDURAL HISTORY

On September 21, 2015, plaintiff filed a complaint against defendant Reading Health System and some of the doctors who treated him while at the hospital. (Doc. No. 1). Plaintiff subsequently amended this complaint. (Doc. No. 15). He brought claims under the Emergency Medical Treatment and Active Labor Act (EMTALA), the ADA, and § 504 of the RA. He also brought a negligence claim under Pennsylvania law.

Defendants filed a motion to dismiss the amended complaint, which I granted in part and denied in part. See Hollinger v. Reading Health Sys., Civ. A. No. 15-5249, 2016 WL 3762987 (E.D. Pa. July 14, 2016) (dismissing EMTALA claims with prejudice, ADA and RA claims without prejudice, and denying motion to dismiss negligence claim). I dismissed the ADA claim because plaintiff failed to establish standing. Id. at *11. I dismissed the RA claim because it sounded in medical negligence rather than discrimination. Id. at *13.

Plaintiff filed a second amended complaint in which he reasserts the ADA, RA, and negligence claims. Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## IV.   LEGAL STANDARD

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6);

see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Subsequently, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the

complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555).

The basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ. A. 08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## V.    DISCUSSION

Plaintiff seeks relief pursuant to Title III of the ADA and § 504 of the RA. Under Title III of the ADA, plaintiff seeks purely injunctive relief. Under the RA, he seeks injunctive and monetary relief.

### A.    ADA Claim

According to plaintiff, defendants violated Title III of the ADA by discharging him prematurely due to his aggression toward staff, which was a manifestation of his alcoholism. Plaintiff also alleges defendants had a custom or practice of "referring all episodes of patient malfeasance and physical contact with staff to police, regardless of whether a given patient presents a threat to safety." (Doc. No. 36 ¶ 158).

6

Defendants move to dismiss plaintiff's ADA claim on two bases. First, they argue plaintiff does not have standing. Second, they argue plaintiff has failed to state a claim for relief under the ADA.

### 1.    <u>Standing</u>

The judicial power conferred to federal courts by Article III of the United States Constitution only extends to "cases" or "controversies." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). This doctrine, known as standing, has three distinct requirements. <u>Id.</u> at 560–61. To satisfy Article III's standing requirements, a plaintiff must demonstrate:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
>
> (2) the injury is fairly traceable to the challenged action of the defendant; and
>
> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180–81 (2000) (quoting <u>Lujan</u>, 504 U.S. at 560–61).

In the context of prospective injunctive relief, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects." <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495–96 (1974). A plaintiff seeking prospective injunctive relief must show a real and immediate threat of repeated future injury in order to satisfy the "injury in fact" requirement of Article III. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 102, 105 (1983).

Under Title III of the ADA, injunctive relief is the only type of remedy available. 42 U.S.C. § 12188(a); Brown v. Mt. Fuji Japanese Rest., 615 F. App'x 757, 757 (3d Cir. 2015); Hollinger, 2016 WL 3762987, at *10; Anderson v. Macy's, Inc., 943 F. Supp. 2d 531, 538 (W.D. Pa. 2013); Reviello v. Phila. Fed. Credit Union, No. Civ. A. 12-508, 2012 WL 2196320, at *4 (E.D. Pa. June 14, 2012). "Because the remedy for a private ADA Title III violation is injunctive relief, courts look beyond the alleged past violation and consider the possibility of future violations." Anderson, 943 F. Supp. 2d at 538. In other words, a plaintiff seeking relief under Title III must demonstrate that there is a real and immediate threat that it will be wronged again in the future. Brown, 615 F. App'x at 757–58.

Courts have developed two potential avenues for plaintiffs to establish standing under Title III of the ADA: (1) the intent to return method, and (2) the deterrent effect doctrine. Hollinger, 2016 WL 3762987, at *10.[2] Under the intent to return method, a plaintiff can show that he or she faces a real and immediate threat of future injury by demonstrating an intent to return to the place where the alleged discrimination occurred. Garner v. VIST Bank, Civ. A. No. 12–5258, 2013 WL 6731903, at *5 (E.D. Pa. Dec. 20, 2013). The specific requirements of the intent to return method are as follows: (1) plaintiff has alleged defendant engaged in past discriminatory conduct that violates the ADA; (2) it is reasonable to infer from the allegations in the complaint that the

---

[2] The Third Circuit has only addressed the issue of standing under Title III of the ADA one time. In that case, the court did not mention the deterrent effect doctrine. Instead, it relied solely on the intent to return test. Brown, 615 F. App'x at 758. However, it is still unclear whether the Third Circuit recognizes the deterrent effect doctrine, the intent to return method, or both, as viable means for establishing standing under Title III of the ADA.

discriminatory conduct will continue; and (3) it is reasonable to infer based on past patronage, proximity of the place to the plaintiff's home, business, or personal connections to the area, that the plaintiff intends to return to the place in the future. Id.[3]

Under the second avenue, the deterrent effect doctrine, Article III's standing requirements are met when the plaintiff is deterred from patronizing a public accommodation because of accessibility barriers. Anderson v. Franklin Inst., 185 F. Supp. 3d 628, 640 (E.D. Pa. 2016). This test requires that the plaintiff have actual knowledge of barriers that prevent equal access. Id. The test also requires the plaintiff to show a reasonable likelihood that he or she would use the public place if it were not for the discrimination. Id. Even under the deterrent effect test, a plaintiff must still show that he or she has an intent to return to the place of alleged discrimination. Hollinger, 2016 WL 3762987, at *11.

### a.      Intent to Return Method

Plaintiff's second amended complaint fails to establish standing under the intent to return method. At best, plaintiff's allegations present the mere possibility that he may return to Reading Hospital in the future.

According to plaintiff, there is a fifty percent chance he will go to Reading Hospital again (and that is assuming he will need emergency medical treatment in the

---

[3] Some courts have articulated this test slightly differently. Those courts require consideration of the following elements: (1) the proximity of the defendant's business to plaintiff's residence; (2) plaintiff's past patronage of defendant's business; (3) the definitiveness of plaintiff's plans to return; and (4) plaintiff's frequency of travel near the defendant's business. Brown, 615 F. App'x at 758; Anderson, 943 F. Supp. 2d at 539. However, the gist of the test under both formulations is the same. Both tests require consideration of a plaintiff's intent to return to the place of accommodation, as well as his proximity and patronage to the place of accommodation.

future). Courts in and outside the Third Circuit have unanimously made clear that "[a] plaintiff's intention to return to the place she visited 'some day'—'without any description of concrete plans'—is insufficient" to establish standing to seek injunctive relief under Title III. Brown, 615 F. App'x at 758 (quoting Lujan, 504 U.S. at 564); Anderson, 943 F. Supp. 2d at 540–41; Voices for Independence v. Pa. Dep't Transp., Civ. A. No. 06-78, 2007 WL 2905887, at *14 (W.D. Pa. Sept. 28, 2007); W.G. Nichols, Inc. v. Ferguson, No. Civ. A. 01-834, 2002 WL 1335118, at *10 (E.D. Pa. June 7, 2002); accord Freezor v. Sears, Roebuck & Co., 608 F. App'x 476, 477 (9th Cir. 2015).[4]

The "past patronage" element of the intent to return method further supports this finding. Plaintiff has failed to demonstrate that he previously frequented Reading Hospital. In fact, he does not allege he had ever been there before. Such facts weigh heavily in favor of finding no immediate threat of future harm. See Anderson, 943 F. Supp. 2d at 540 ("When a plaintiff visits a public accommodation 'only once, the lack of a history of past patronage seems to negate the possibility of future injury at [that] particular location.'" (quoting Molski v. Kahn Winery, 405 F. Supp. 2d 1160, 1164 (C.D. Cal. 2005)); Reviello, 2012 WL 2196320, at *5 ("When a plaintiff has visited a public accommodation only once his lack of past patronage negates the possibility of future injury unless he can show a business or familial connection to the location.").

Finally, there is a different emergency room near plaintiff's home in Reading. This only lessens the chance that plaintiff will return to Reading Hospital. This mere chance is

---

[4] While plaintiff is correct that he need not identify an exact date of return, he still must do more than allege that "some day" he will return to Reading Hospital. Lujan, 504 U.S. at 564; Reilly v. Ceridian Corp., 664 F.3d 38, 42 (3d Cir. 2011); Brown, 615 F. App'x at 758; Anderson, 943 F. Supp. 2d at 540–41; Oliver v. Thornburgh, 587 F. Supp. 380, 382 (E.D. Pa. 1984).

further weakened by plaintiff's assertion that, given the choice between Reading Hospital and the other emergency room, he would choose to go to the other emergency room—not Reading Hospital. Thus, it cannot be said plaintiff has any intent to return to Reading Hospital when he has specifically alleged the opposite.

Plaintiff's allegations regarding his intent to return to Reading Hospital are speculative and indefinite. Accordingly, he is unable to show a real and immediate threat of injury sufficient to confer standing to seek injunctive relief under the intent to return method.

### b.      Deterrent Effect Doctrine

Plaintiff also cannot establish standing under the deterrent effect doctrine. This method requires him to show that he has "actual knowledge of barriers preventing equal access and a reasonable likelihood that [he] would use the facility if not for the barriers." Anderson, 185 F. Supp. 3d at 640.

Plaintiff alleges that he does not want to return to Reading Hospital in the future because he suffered discrimination there. However, nothing in the second amended complaint establishes that plaintiff has actual knowledge of barriers preventing equal access to alcoholics or cognitively disabled patients at Reading Hospital. The second amended complaint avers Reading Hospital has prematurely discharged many violent or disruptive patients into law enforcement custody. Notably, it avers Reading Hospital does this regardless of whether the patient is disabled.

Mr. Hollinger is the sole plaintiff in this case.[5] He does not identify any of the individuals who he alleges were improperly discharged. He provides absolutely no factual details, other than vague and conclusory statements, regarding Reading Hospital's purported "ongoing pattern" or "custom" of discharging patients into law enforcement custody. Plaintiff's allegations are lacking when compared to other cases in which standing was met under the deterrent effect doctrine.

In Anderson v. Franklin Institute, a museum charged personal care assistants a fee when they accompanied disabled patrons. 185 F. Supp. 3d at 630. The plaintiff, a severely disabled person, claimed this violated Title III of the ADA and that he had standing under the deterrent effect doctrine. Anderson, 185 F. Supp. 3d at 630, 640–41. Judge McHugh agreed, noting that the plaintiff was "clearly deterred from visiting [the museum] on a regular basis" because the museum insisted on charging his personal care assistant an admission fee. Id. at 640. It was unmistakably clear—and the museum did not dispute—that it had a concrete policy of charging personal care assistants an admission fee. Id.

Here, unlike in Anderson, there is no actual knowledge of a concrete policy that prevents equal access to persons with disabilities. Instead, plaintiff bases his "actual knowledge" of barriers preventing equal access solely on the alleged experiences of other

---

[5] Plaintiff rests much of his claim on conclusory statements about other allegedly disabled patients who are not parties to this action. The second amended complaint speaks of "dozens" of patients who have been to Reading Hospital for treatment of mental illness, senility, or substance abuse. (Doc. No. 36 ¶ 74). It states that "many" patients similar to plaintiff have also been prematurely discharged. (Id. ¶¶ 75–77, 79, 173). It is well established that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975). Accordingly, plaintiff's assertions as to other non-parties do not support his own, personal, legal claim against Reading Hospital.

unknown patients. (Doc. No. 36 ¶¶ 74–76, 83, 87–88). If plaintiff's conclusory statements were supported by factual detail, his allegations might mass muster. Ashcroft, 556 U.S. at 678–79. Instead, they consist solely of vague references to "other" patients whose "episodes" and experiences "mirror" plaintiff's. Without more, I cannot find that plaintiff has sufficiently demonstrated actual knowledge of barriers preventing access at Reading Hospital. Cf. Anderson, 185 F. Supp. 3d at 640–41 (relying on the museum's concrete policy of charging personal care assistants for general admission as a sufficient demonstration of actual knowledge under the deterrent effect doctrine).

In short, plaintiff alleges that he slapped a nurse in the face and was continually attempting to hit staff members. Plaintiff seems to acknowledge that his conduct could be a crime under Pennsylvania law.[6] Viewing these well-pled facts as true, there is no indication that Reading Hospital refers episodes of patient malfeasance to the police "regardless of whether a given patient presents a threat to safety." (Doc. No. 36 ¶ 158). On the contrary, screaming obscenities, trying to hit people, and hitting a nurse in the

---

[6] Plaintiff does not indicate in the second amended complaint whether or not he was convicted on the aggravated assault charge. However, a public record search of the Court of Common Pleas of Berks County reflects that plaintiff pled guilty to the aggravated assault charge on April 10, 2014. This is revealing in light of plaintiff's characterization of his prison stay as an improper confinement. In reality, this 200-day "confinement" was actually a sentence imposed pursuant to plaintiff's plea of guilty to aggravated assault. My consideration of these facts, though outside the complaint, is not improper and does not transform defendants' Rule 12(b) motion into a motion for summary judgment. See Pryor v. NCAA, 288 F.3d 548, 560 (3d Cir. 2002) ("[C]ertain matters outside the body of the complaint itself, such as . . . facts of which the court will take judicial notice, will not trigger the conversion of an FRCP 12(b)(6) motion to dismiss to an FRCP 56 motion for summary judgment."); see also Fed. R. Civ. P. 201(c)(1) (noting that a court "may take judicial notice on its own"); Fed. R. Civ. P. 201(d) ("The court may take judicial notice at any stage of the proceeding."). Admittedly, my consideration of these facts has no bearing on the merits of plaintiff's claims. Nonetheless, plaintiff has attempted to use the prison sentence imposed upon him (per a guilty plea) as a weapon against defendants in this case. Specifically, the second amended complaint makes it appear as if the fault for plaintiff's 200-day prison stay falls on Reading Hospital. I find this suggestion disingenuous given that the 200-day prison stay instead appears to be the result of plaintiff's own guilty plea.

face are all acts that undoubtedly present a threat to the safety of Reading Hospital's staff. More importantly, this alleged custom could not possibly deny equal access when plaintiff contends it applies with equal force to disabled and non-disabled patients.

In sum, plaintiff has failed to show he has any actual knowledge of barriers posed by Reading Hospital to those with mental disabilities or alcoholism. Accordingly, he is unable to establish standing under the deterrent effect doctrine.

### c.   *Redressability by a Favorable Decision*

Plaintiff cannot establish standing also because he has failed to demonstrate how a favorable decision on his ADA claim would remedy his alleged injuries. As with any case in federal court, plaintiff must show that it "is likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." Friends of the Earth, 528 U.S. at 180–81 (quoting Lujan, 504 U.S. at 560–61).

With this standing requirement in mind, plaintiff seeks injunctive relief under the ADA in two forms. First, he requests an injunction requiring Reading Hospital to stabilize all its patients prior to discharging them into police custody. Second, he requests an injunction requiring Reading Hospital to develop a protocol to evaluate situations involving violence by disabled patients. Even if I were to grant a decision favorable to plaintiff and impose these injunctions, doing so would not in any way remedy his past alleged injuries. Therefore, he has no "personal stake in the outcome" of the case necessary to make out the "concrete adverseness" needed to confer standing under Article III. Baker v. Carr, 369 U.S. 186, 204 (1962).

In <u>Lyons v. City of Los Angeles</u>, the U.S. Supreme Court confronted a similar situation. 461 U.S. 95, 105 (1983). There, the plaintiff filed a civil rights claim against the Los Angeles Police Department after he was put in a chokehold by one of its officers. <u>Lyons</u>, 461 U.S. at 97–98. The plaintiff sought an injunction against the City barring its police officers from using chokeholds to subdue suspects. <u>Id.</u> at 98. The Court held that the plaintiff did not have standing to pursue the injunction because it was highly speculative, not likely, that he would again be subject to a chokehold in the future. <u>Id.</u> at 102–05; <u>see</u> <u>also</u> <u>id.</u> at 107 n.8 ("It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.") (emphasis in original).

As with the potential future harm in <u>Lyons</u>, it is mere conjecture to speculate that plaintiff will again be admitted to Reading Hospital, become violent there, strike a nurse, and then be discharged into police custody. In the same vein, it would be pure speculation to conclude that imposing plaintiff's proposed injunctions would ever have any personal effect on plaintiff. What is clear, on the contrary, is that the ADA injunctions plaintiff seeks would not—and could not—cure the *past* injuries that he alleges he suffered. As Title III of the ADA only provides injunctive relief, it necessarily follows that plaintiff has not presented a live "case" or "controversy."

For all the above reasons, plaintiff does not have standing to seek injunctive relief under Title III of the ADA.

## 2.    <u>Prima Facie Case of Discrimination</u>

Even if plaintiff did have standing, his ADA claim would fail for a much simpler reason: he has failed to state a claim for relief.

Title III of the ADA prohibits places of public accommodation from discriminating against disabled persons. <u>PGA Tour, Inc v. Martin</u>, 532 U.S. 661, 675 (2001). Specifically, it states as a general rule: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The definition of a place of "public accommodation" covers various types of places. <u>PGA Tour</u>, 532 U.S. at 676. Hospitals qualify as places of public accommodation under the ADA. 42 U.S.C. § 12181(7)(F). To state a claim under Title III of the ADA, a plaintiff must show: (1) he or she was discriminated against on the basis of a disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor, or operator. <u>Anderson</u>, 943 F. Supp. 2d 542–43.[7]

Plaintiff has failed to establish facts satisfying the first prong—that he was discriminated against on the basis of his disability. The second amended complaint indicates that plaintiff was discharged from Reading Hospital because he was

---

[7] The defendants do not dispute that plaintiff is "disabled" for purposes of the ADA. The Third Circuit has not squarely addressed whether alcoholism qualifies as a disability under the ADA. <u>Hollinger</u>, 2016 WL 3762987, at *10 n.7.

increasingly violent, overly aggressive, and struck a nurse in the face. According to plaintiff, this behavior was a manifestation of his alcoholism and alcohol-related health conditions. Even if this is true, plaintiff has still not stated a claim for disability discrimination.

The deficiency with plaintiff's claim is not that prematurely discharging a hospital patient because of that patient's disability does not violate Title III of the ADA. Such conduct would certainly violate the ADA. The fatal flaw in plaintiff's claim is that he has not alleged any facts showing that Reading Hospital does not, or would not, discharge a non-alcoholic or non-disabled patient for violent conduct. More specifically, plaintiff does not allege that Reading Hospital would retain, or has retained, a non-alcoholic or non-disabled patient who was trying to hit its staff members and who struck one of its nurses in the face. He also does not allege that Reading Hospital would not call, or has not called, the police on *any* patient who hit a staff member in the face or became violent.[8] Viewing plaintiff's well-pled facts as true, the second amended complaint

---

[8] Paragraph 88 of the second amended complaint accurately embodies the inherent flaw in plaintiff's claim: "Specifically, the net result of the custom or practice described above is that patients with mental illness, senility, or substance abuse issues are discharged prematurely, and earlier than they would have had their care not been complicated by police intervention." (Doc. No. 36 ¶ 88). Plaintiff's entire claim is that patients with substance abuse issues, mental illness, or senility who display violence are discharged into police custody prematurely. However, plaintiff's second amended complaint lacks any facts as to the treatment of non-disabled patients when non-disabled patients act violently or physically assault staff. Plaintiff has failed to plead a single instance where defendants discharged an alcoholic patient for violent behavior but did not discharge a non-disabled patient for the same or similar violent behavior. In fact, plaintiff pleads the opposite: "These episodes stem from the Hospital's custom or practice of referring all episodes of patient malfeasance and physical contact with staff to police, regardless of whether a given patient presents a threat to safety." (Id. ¶ 174). If the hospital has a practice of referring "all" episodes of patient violence to police, this necessarily implies that the hospital also prematurely refers non-disabled patients into police custody. Such a "custom or practice" may very well amount to negligence or violation of some other law, but it does not speak of discrimination.

merely shows that Reading Hospital admitted plaintiff and treated him with psychiatric care, medical care, medication, and constant supervision. Plaintiff's aggression toward others would not subsist and culminated with him hitting a nurse in the face. It was not until this occurred, the second week into plaintiff's stay, that the hospital resorted to law enforcement intervention. Such facts do not state a claim for relief under the ADA.[9]

Plaintiff's ADA claim must be dismissed for reasons separate and apart from those already discussed. Namely, this Circuit's precedent has made clear that a hospital's denial of medical treatment for a person's disabilities is not the type of claim encompassed by the ADA. E.g., Iseley v. Beard, 200 F. App'x 137, 142 (3d Cir. 2006); Rosario v. Washington Mem. Hosp., Civ. A. No. 12-1799, 2013 WL 2158584, at *13 (W.D. Pa. May 17, 2013). Plaintiff's second amended complaint alleges that he was denied medical treatment when he was discharged prematurely due to his alcoholism and brain atrophy. This is the exact type of denial-of-treatment claim that courts have forbid the ADA from applying to.

In sum, plaintiff's second amended complaint fails to allege any facts showing that defendants discriminated against him on the basis of a disability. Furthermore, plaintiff's claim is based on defendants' medical treatment decisions, which is not cognizable under the ADA. For all the foregoing reasons, plaintiff's ADA claim must be dismissed.

---

[9] Any allegations that the hospital failed to properly treat plaintiff, or discharged him too early, sound in medical negligence—not discrimination. See Stewart v. Wagner, Civ. A. No. 07-0177, 2013 WL 135172, at *4 (E.D. Pa. Jan. 9, 2013) (dismissing ADA claim because the ADA "cannot be used to bring a claim for medical negligence").

**B.      Rehabilitation Act Claim**

In addition to his ADA claim, plaintiff also brings a claim pursuant to § 504 of the RA. Because plaintiff fails to state a claim for relief under the RA, I will dismiss this claim.

Section 504 of the RA states:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). In essence, the RA prohibits discrimination on the basis of disability by programs that receive federal funding. "[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014) (quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282 (3d Cir. 2012)). To make out a *prima facie* case under the RA, a plaintiff must show: (1) he or she is handicapped or disabled as defined under the statute; (2) he or she is otherwise qualified to participate in the program at issue; and (3) he or she was precluded from participating in a program or receiving a service or benefit because of his or her disability. CG v. Pa. Dep't Educ., 734 F.3d 229, 235 (3d Cir. 2013).

As with the ADA, courts consistently hold that § 504 of the RA cannot be construed to provide a cause of action for medical treatment decisions. See Watson v. A.I. DuPont Hosp., Civ. A. No. 05–674, 2007 WL 1009065, at *2 (E.D. Pa. Mar. 30, 2007) (Pollak, J.) (noting that "medical treatment decisions are outside the purview of §

19

504"); <u>Farrell v. A.I. DuPont Hosp.</u>, Civ. A. Nos. 04-3877, 05-417, 05-441, 05-661, 2006 WL 1284947, at *6 (E.D. Pa. May 5, 2006) ("While an examination of complex medical decisions is commonly made with respect to negligence claims, such medical decisions are removed from the purview of the Rehabilitation Act."); <u>Rosario</u>, 2013 WL 2158584, at *14 (collecting cases concluding that "neither the ADA nor the Rehabilitation Act provide remedies for alleged medical negligence").

Plaintiff's RA claim is one that criticizes the medical treatment decisions of Reading Hospital: "[Plaintiff] was denied medical services relating to his alcohol withdrawal, brain atrophy, and cognitive defects." (Doc. No. 36 ¶ 170).[10] He alleges that he was discharged prematurely for his agitation, confusion, and violence, and because he had the potential of being a long-term patient. Plaintiff places the blame for this allegedly premature discharge on several named defendants, who were physicians at the hospital.

The court in <u>Rosario v. Washington Memorial Hospital</u> dismissed a nearly identical § 504 claim. 2013 WL 2158584, at *14. The plaintiff there had been a hospital patient. <u>Id.</u> at *8. He claimed the defendants violated § 504 of the RA by failing to "adequately treat [his] mental health issues and/or fail[ing] to civilly commit [him] for mental health treatment." <u>Id.</u> at *13. This sort of claim, the court held, is not cognizable under the RA. <u>See id.</u> at *5 ("These statutes [i.e., the ADA and the Rehabilitation Act] afford disabled persons legal rights regarding access to programs and activities enjoyed

---

[10] I agree with defendants that plaintiff's addition of the buzz words "custom or practice" to his second amended complaint does not magically transform the claim into one that has to do with more than just medical treatment decisions. (Doc. No. 42 at 2). A thorough reading of the second amended complaint reveals that its allegations relate exclusively to the medical treatment decisions made by Reading Hospital's doctors and staff. (Doc. No. 36 ¶¶ 30–32, 35–36, 64, 96–99, 102, 105, 107–08, 113).

by all, not a general federal cause of action for challenging the medical treatment of their underlying disabilities." (quoting Moore v. Prison Health Servs., Inc., 201 F.3d 448 (Table), 1999 WL 1079848, at *1 (10th Cir. 1999) (alterations in original)).[11]

Perhaps recognizing that his claim does not allege any discriminatory animus on the part of the hospital, plaintiff attempts to pursue a disparate-impact theory of liability. (Doc. No. 42 at 1–2). As previously discussed, plaintiff accuses the hospital of having a "custom or practice" of discharging "problem patients" into law enforcement custody. (Id.) Plaintiff concedes this "custom or practice" is facially neutral. Nonetheless, he argues it has a disparate impact on the care afforded to patients with alcoholism or mental disabilities because such patients are more likely than non-disabled patients to act out and be violent.

In some RA cases, plaintiffs may pursue a disparate-impact theory of liability. CG, 734 F.3d at 236–37. However, the U.S. Supreme Court has rejected "the boundless notion

---

[11] Plaintiff's argument that his allegations relate to administrative decision-making by Reading Health lacks merit. On the contrary, his claim concerns allegations that he did not receive adequate medical treatment. For instance, plaintiff takes issue with how Reading Health administered his medication, which medication they administered, when they administered medication, when they discharged him, when they implemented their alcohol withdrawal protocol, and other strictly medical decisions. Not a single allegation in plaintiff's second amended complaint mentions a hospital administrator, executive, or other high-level decision maker. Instead, the second amended complaint deals exclusively with doctors, nurses, and other medical staff. Plaintiff's claim is much different than claims involving administrative decision-making. Compare Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1012 (3d Cir. 1995) (holding that a nursing home's actions amounted to "administrative decision-making" that fell under the RA when the nursing home's admissions committee, which consisted of the Medical Director, Director of Administration, Director of Nursing, and Director of Psycho-Services, decided not to admit plaintiff to the nursing home since it could not reasonably accommodate her Alzheimer's disease), with Rosario, 2013 WL 2158584, at *9, *12–14 (plaintiff's RA claim that he became agitated, splashed hospital nurses with his blood, and then was improperly and prematurely discharged into police custody concerned medical treatment decisions), and Brown v. Ancora Psychiatric Hosp., Civ. No. 11-7159, 2013 WL 4033712, at *5–6 (D.N.J. Aug. 7, 2013) (rejecting plaintiff's argument that his RA claim was based on administrative decision-making when "the heart" of plaintiff's complaint was "not that he was denied access but that the treatment afforded to [plaintiff] was not good enough").

that all disparate-impact showings constitute prima facie cases" under the RA. Id. at 237 (quoting Alexander v. Choate, 469 U.S. 287, 299 (1985)). Instead, to make out a prima facie claim for disparate impact under the RA, the plaintiff must show that he or she "has been deprived of meaningful access to a benefit to which he or she was entitled." Id. at 237.

Applying the above analysis, courts have held that many RA claims alleging a disparate impact do not truly deny handicapped individuals "meaningful access." See, e.g., id. at 236–37 (holding that "[e]ven assuming [Pennsylvania's school funding formula] has a disparate impact on certain disabled students, and even if the inequity stems at least in part from the location of their school, this alone is insufficient to prove a claim under the RA or ADA"). In Alexander v. Choate, the U.S. Supreme Court confronted a challenge under the RA to a Tennessee regulation. 469 U.S. at 289. The regulation at issue reduced the number of days that the state would use its Medicaid funds to pay for Medicaid recipients' inpatient hospital stays. Choate, 469 U.S. at 289. The Court rejected the plaintiffs' disparate impact claim because the regulation did not deny handicapped individuals access or exclude them from Medicaid services, and also because the regulation applied to both handicapped and non-handicapped individuals. Id. at 309.

Even assuming Reading Hospital has a custom of discharging violent and aggressive patients into law enforcement custody, this custom does not deny plaintiff meaningful access to medical services or exclude him from those services. The custom does not differentiate between handicapped and non-handicapped patients. As with the

Medicaid recipients in <u>Choate</u>, "it cannot be argued that 'meaningful access' to [Reading Hospital's medical services] will be denied" even if Reading Hospital discharges violent patients into law enforcement custody. 469 U.S. at 302. Also similar to <u>Choate</u>, Reading Hospital's custom "will leave both handicapped and non-handicapped [patients] with identical and effective hospital services fully available for their use, with both classes of users subject to the same" requirement that they not physically assault the hospital staff.

I am not persuaded by plaintiff's suggestion that his claim is cognizable simply because patients with alcoholism, mental, or behavioral health issues may be affected more than patients without these conditions. <u>Cf. CG</u>, 734 F.3d at 236–37. It is true that, in some scenarios, to be provided meaningful access to services, handicapped individuals must be provided with reasonable accommodation. <u>Choate</u>, 469 U.S. at 300–01. However, the U.S. Supreme Court has made clear that entities falling under the RA's purview are not required to make "fundamental" or "substantial" alterations in the services they provide merely because not doing so may have a greater effect on those with disabilities. <u>Id.</u>

The U.S. Supreme Court applied these principles in <u>Southeastern Community College v. Davis</u>, where a plaintiff with a hearing disability was denied admission to nursing school. 442 U.S. 397 (1979). The school determined that the plaintiff would be unable to safely perform the functions of a nurse even with full-time supervision. <u>Davis</u>, 442 U.S. at 408–09. The Court emphasized that providing personal supervision to the plaintiff would be the type of "fundamental alteration in the nature of a program" that was not required by the RA. <u>Choate</u>, 469 U.S. at 300 (<u>quoting Davis</u>, 442 U.S. at 410). In

23

the same vein, providing this assistance would "have compromised the essential nature of the college's nursing program." Id. (quoting Davis, 442 U.S. at 300). Thus, it has been said that "Davis . . . struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs." Id. at 300.

Keeping this balance in mind, and accepting the allegations of the second amended complaint as true, I find that the RA was not intended to provide plaintiff with the type of special treatment he appears to seek. In arguing that Reading Hospital prematurely discharges patients who become violent, plaintiff necessarily proposes an implausible alternative: regardless of the physical violence inflicted upon its staff, Reading Hospital should essentially tolerate bad behavior, not discharge violent patients, and not seek law enforcement assistance, because some violent patients may be chronic alcoholics or suffer from cognitive difficulties. This proposal is not tenable.

If requiring a nursing school to provide supervision to a hearing-disabled student constitutes a "fundamental alteration" not required by the RA, Davis, 442 U.S. at 410, then certainly the same goes for a requirement that a hospital disregard or endure patients' physical assaults on its staff. In Davis, the Supreme Court emphasized that providing a personal assistant to a nursing student would compromise the essential nature of the nursing school program. If that is the case, then clearly a much more drastic measure—enduring patient violence—would compromise the essential nature of a

hospital's ability to effectively carry out its program. Such expectations are not "reasonable ones." Choate, 469 U.S. at 300.[12]

For all the foregoing reasons, plaintiff has failed to state a cognizable claim under the RA under any reasonable reading of the second amended complaint. This is true regardless of whether plaintiff is pursuing a disparate impact or a disparate treatment claim. Accordingly, I must dismiss plaintiff's RA claim.[13]

### C.     Negligence Claim

Having dismissed the ADA and RA claims, the only remaining claim to be addressed is one for negligence under Pennsylvania law. Because I am dismissing all federal claims against Reading Hospital, I will decline to exercise supplemental jurisdiction over the plaintiff's state law claim. 28 U.S.C. § 1367(c)(3); Pittman v. Martin, 569 F. App'x 89, 92 (3d Cir. 2014); LaRose v. Chichester Sch. Dist., Civ. A. No. 09–2557, 2010 WL 1254305, at *2 (E.D. Pa. Mar. 31, 2010).

---

[12] I also find that such a scenario would drastically compromise the safety of Reading Hospital's patients and staff, as well as the integrity of Reading Hospital's program. Choate, 469 U.S. at 300. In that sense, this case is a perfect example of the balancing act struck between disabled individuals' right to be integrated into society and the legitimate interest of federal grantees in the integrity of their programs. Id. I cannot agree with plaintiff that the second amended complaint shows "disabled patients at the Hospital receive less care and lower quality care than counterparts without disabilities because the Hospital dumps them into the criminal justice system to save money." (Doc. No. 45 at 2). On the contrary, the second amended complaint shows that plaintiff was treated for ten days and even given special attention and supervision in an attempt to prevent him from harming himself. (Doc. No. 36 ¶ 44). It was not until after he had been attempting to hit staff, and was successful in doing so, that he was discharged for conduct he admits can amount to a crime under Pennsylvania law. (Id. ¶ 78). These facts merely show that Reading Hospital does not tolerate physical violence toward its staff—not that it "dumps [disabled patients] into the criminal justice system to save money." (Doc. No. 45 at 2).

[13] For the same reasons plaintiff cannot establish a disparate-impact claim under the RA, he likewise cannot establish one under the ADA. See, CG, 734 F.2d at 235–37 (applying an identical analysis to RA and ADA disparate impact claims after noting that "[w]ith limited exceptions, the same legal principles govern ADA and RA claims") (internal footnote omitted).

## VI.  CONCLUSION

Plaintiff has failed to establish standing under the ADA. He has also failed to state a claim under either the RA or the ADA. Accordingly, these claims must be dismissed. I will decline to exercise supplemental jurisdiction over plaintiff's remaining state law claim.

An appropriate Order follows.